COLORADO INTERSTATE GAS CO. *v.* FEDERAL
POWER COMMISSION ET AL.

NO. 379.

Argued January 29, 30, 1945.—Decided April 2, 1945.

582

*Mr. Wm. A. Dougherty,* with whom *Messrs. Elmer L. Brock* and *E. R. Campbell* were on the brief, for petitioner in No. 379. *Messrs. John P. Akolt* and *Charles H. Keffer* for petitioner in No. 380.

*Mr. Charles V. Shannon* (in Nos. 379 and 380) and *Mr. Chester T. Lane* (in No. 380), with whom *Solicitor General Fahy, Assistant Attorney General Shea, Messrs. Paul A. Sweeney, Harry S. Littman, Stanley M. Morley, Malcolm Lindsey, Thomas H. Gibson* and *Louis J. O'Marr,* Attorney General of Wyoming, were on the brief, for the Federal Power Commission et al., respondents.

*Mr. Carl I. Wheat,* with whom *Mr. Robert E. May* was on the brief, for the Independent Natural Gas Association of America, as *amicus curiae* in No. 380, urging reversal.

Mr. Justice Douglas delivered the opinion of the Court.

The Federal Power Commission after an investigation and hearing entered orders under § 5 of the Natural Gas Act of 1938 (52 Stat. 823, 15 U. S. C. § 717d) finding the interstate wholesale rates of petitioners to be excessive by specified amounts per year and requiring petitioners to reduce the rates accordingly. 43 P. U. R. (N. S.) 205. The Circuit Court of Appeals for the Tenth Circuit affirmed the Commission's orders. 142 F. 2d 943. The cases are here on petitions for certiorari which we granted, limited to the few questions to which we will presently advert.

Petitioners (to whom we will refer as Canadian and as Colorado Interstate) had their origin in an agreement made in 1927 between Southwestern Development Co. (Southwestern), Standard Oil Co. (N. J.) (Standard) and Cities Service Co. (Cities Service). It was the purpose of the agreement to bring natural gas from the Panhandle field in Texas to the Colorado markets, including Denver and Pueblo. Southwestern agreed to transfer through a wholly owned subsidiary, Amarillo Oil Co. (Amarillo), certain gas leaseholds and producing properties to a new subsidiary (Canadian) which it would organize for that purpose. Standard agreed to form a new corporation (Colorado Interstate) and to finance its construction of pipeline facilities which would connect with Canadian's facilities and transport gas from those points in the Panhandle field to the Colorado markets. Cities Service agreed to use its best efforts to obtain franchises through its subsidiaries under which the natural gas could be distributed in certain cities in Colorado including Denver and Pueblo. The gas was to be sold to Colorado Interstate by Canadian at cost (as defined in the contract) for at least 20 years from 1928. We will return

to other details of this tripartite agreement and of the organization and financing of Canadian and Colorado Interstate. It is sufficient here to say that the companies were incorporated, the pipeline was built, and the business put into operation. Although Canadian and Colorado Interstate are separate companies, the Commission found that their properties have been operated as a single enterprise.

Canadian produces from its own properties all the gas which it sells. It has about 300,000 acres of natural gas leaseholds and on December 31, 1939, was operating 94 wells. Its gathering system consists of approximately 144 miles of pipe. It owns and operates a transmission line which connects with its gathering system in the Panhandle field and ends about 85 miles distant at a point near Clayton, New Mexico. Canadian sells some of its gas at the wellhead and along the Texas portion of its transmission line for consumption in Texas. It also sells gas for resale in Clayton, New Mexico. But the chief portion of the gas in its transmission line is sold at that point to Colorado Interstate. The pipeline of Colorado Interstate extends to Denver. It sells the gas to various distributing companies for resale by them in Colorado and in a few points in Wyoming.[1] Colorado Interstate also sells gas from this pipeline direct to industrial customers in Colorado for their own use.

It is thus apparent that the pipeline from Texas to Colorado serves three different uses: (a) intrastate transportation and sale in Texas; (b) interstate transportation

---

[1] The latter resales are made by Colorado-Wyoming Gas Co. which transports the gas from a point near Littleton, Colorado to Cheyenne, Wyoming. The proceedings against this company were consolidated with those against Canadian and Colorado Interstate. The Commission also ordered a reduction in the rates charged by Colorado-Wyoming Gas Co. That order is here for review on certain points in No. 575, *post,* p. 626.

and sale to industrial customers; and (c) interstate transportation to distributing companies for resale. Only some of those activities are subject to the jurisdiction of the Commission. For § 1 (b) of the Act provides:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

It is around the meaning and implications of that provision that most of the present controversy turns.

*Allocation of Cost of Service.* The questions raised by Colorado Interstate and some of those raised by Canadian relate to the failure of the Commission (1) to separate the physical property used in common in the intrastate and interstate business; (2) to separate that used in common in the sales of gas to industrial consumers and the sales of gas for resale; and (3) to separate the property used exclusively in intrastate business or exclusively for industrial sales. The Commission thought it unnecessary to make such a separation of the properties. It noted that nowhere in the evidence presented by petitioners was there "a complete presentation of the entire operations of the company broken down between jurisdictional and nonjurisdictional operations." 43 P. U. R. (N. S.), p. 232. And it concluded, "All that can be accomplished by an allocation of physical properties can be attained by allocating costs including the return. The latter method is by far the most practical and businesslike." *Id.*, p. 232. The Commission adopted the so-called "demand and

commodity" method for allocating costs. Cf. *Arkansas Louisiana Gas Co.* v. *Texarkana*, 96 F. 2d 179, 185. It took the costs and divided them into three classes—volumetric, capacity, distribution.[2] Costs relating to the production system were treated as volumetric.[3] These included rate of return and depreciation and depletion on leases and wells. These volumetric costs were allocated to the customers in proportion to the number of Mcf's delivered to each customer in 1939. The larger share of the transmission costs of the Denver pipeline were classified as capacity costs. Supplies and expenses of compressing systems, maintenance of compressing system equipment and accruals for its depreciation were classed as volumetric. And one-half of the return and income taxes on the Denver pipeline and one-half of operating labor on the compressing system were classed as volumetric, the other half being classed as capacity. Capacity costs were allocated to the customers in the ratio that the Mcf sales to each customer on the system peak day of February 9, 1939, bore to the total sales to all customers on that day. Distribution costs were composed in part of depreciation, taxes, and return on investment in metering and regulating equipment through which gas is delivered at individual stations to each customer. These were allocated to each customer in the ratio which the investment for each customer bore to the total investment in such facilities which were available to serve all customers. Distribution costs also included operating and maintenance expenses incurred in operating the metering and regulating stations. These were allocated on the basis of the number of stations.

---

[2] The Commission in its report characterized volumetric costs as variable costs and capacity costs as fixed costs. 43 P. U. R. (N. S.) p. 232.

[3] A residual refining credit was determined and deducted from production costs.

588

The function which an allocation of costs (including return) is designed to perform in a rate case of this character is clear. The amount of gross revenue from each class of business is known. Some of those revenues are derived from sales at rates which the Commission has no power to fix. The other part of the gross revenues comes from the interstate wholesale rates which are under the Commission's jurisdiction. The problem is to allocate to each class of the business its fair share of the costs. It is of course immaterial that the revenues from the intrastate sales or the direct industrial sales may exceed their costs, since the authority to regulate those phases of the business is lacking. To the extent, however, that the revenues from the interstate wholesale business exceed the costs allocable to that phase of the business, the interstate wholesale rates are excessive. The use of that method in these cases produced the following results:

*Canadian*

|  | Revenues | Costs | Excess Revenue Over Costs |
|---|---|---|---|
| Regulated | $2,151,000 | $1,590,000 | $561,000 |
| Unregulated | 242,000 | 188,000 | 54,000 |

*Colorado Interstate*

|  | Revenues | Costs | Excess Revenue Over Costs |
|---|---|---|---|
| Regulated | $4,438,000 | $2,373,000 | $2,065,000 |
| Unregulated | 1,335,000 | 1,204,000 | 131,000 |

The Commission did not include in the rate reductions which it ordered any of the excess revenues over costs from the unregulated business. The reductions ordered were measured solely by the excess revenues over costs in the regulated business, viz., $2,065,000 in case of Colorado Interstate and $561,000 in case of Canadian.

Colorado Interstate and Canadian make several objections to that method. They maintain in the first place that a segregation of the physical property based upon use is necessary so that the payment due for the use of that

property which is in the public service may be determined. Reliance for that position is rested on the *Minnesota Rate Cases,* 230 U. S. 352, 435, and *Smith* v. *Illinois Bell Telephone Co.,* 282 U. S. 133, 146. Those were cases which involved state regulation of intrastate rates of companies doing both an intrastate and interstate business. But the rule fashioned by this Court for use in those situations was not written into the Natural Gas Act. Congress indeed prescribed no formula for determining how the interstate wholesale business, whose rates are regulated, should be segregated from the other phases of the business whose rates are not regulated. Rate-making is essentially a legislative function. *Munn* v. *Illinois,* 94 U. S. 113. Congress, to be sure, has provided for judicial review of the Commission's orders. § 19. But that review is limited to keeping the Commission within the bounds which Congress has created. When Congress, as here, fails to provide a formula for the Commission to follow, courts are not warranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation. If Congress had prescribed a formula it would be the duty of the Commission to follow it. But we cannot say that under the Natural Gas Act the Commission can employ only one allocation formula and that that formula must entail a segregation of property. A separation of properties is merely a step in the determination of costs properly allocable to the various classes of services rendered by a utility. But where, as here, several classes of services have a common use of the same property, difficulties of separation are obvious. Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science. Hamilton, Cost as a Standard for Price, 4 Law & Cont. Prob. 321. But neither does the separation of properties which are not in fact separable because they function as an integrated whole. Mr. Justice Brandeis,

speaking for the Court in *Groesbeck* v. *Duluth, S. S. & A. R. Co.*, 250 U. S. 607, 614–615, noted that "it is much easier to reject formulas presented as being misleading than to find one apparently adequate." Under this Act the appropriateness of the formula employed by the Commission in a given case raises questions of fact, not of law.

Colorado Interstate claims that the Commission's formula ignored or at least failed to give full effect to the priority which the wholesale gas has over direct industrial sales—a priority recognized in the contracts with industrial users and in the municipal franchises. But over the years the interruptions or curtailments in service to direct industrial customers appear to have been slight.[4] Moreover, to the extent that the priority accorded wholesale gas was actually exercised during the test year (1939) the allocation of costs made by the Commission gave full effect to it. As we have seen, volumetric costs were allocated to the customers in proportion to the number of Mcf's delivered to each customer during the year; capacity costs were allocated in the ratio that the Mcf sales to each customer on the system peak day bore to the total sales on that day. The formula used reflected all actual curtailments of load to each customer during the year and on the system peak day.

Colorado Interstate objects because the Commission treated the transmission line as a unit. It points out that some laterals and equipment (such as metering stations) are used exclusively for making wholesale sales, some are used exclusively for making intrastate sales or direct industrial sales, and some are used in common in varying degrees by the several classes of business. It is pointed out, for example, that the line north of Pueblo is used almost exclusively by the regulated business but that under the Commission's formula the pipeline was treated as

---

[4] Fifteen times in some 12 years.

if all the gas went into the pipe in Texas and came out at the Denver city gate. These objections are partially met by the manner in which distribution costs, to which we have referred, were allocated. But that is no more than a partial answer since they pertained only to metering and regulating equipment. The laterals were not segregated. They, however, appear to be used more commonly for direct industrial rather than for wholesale sales; and we are not convinced that the direct industrial sales were saddled with greater costs than they would have been had the laterals been segregated. The gravamen of this complaint is that the industrial sales are being burdened with costs of a part of the system which the direct industrial gas never uses. That contention points up our earlier observation that judgment and discretion control both the separation of property and the allocation of costs when it is sought to reduce to its component parts a business which functions as an integrated whole. The Commission found that but for the direct industrial market at Pueblo, Colorado and the wholesale market at Denver, the pipeline would not have been constructed. 43 P. U. R. (N. S.) p. 210. It is therefore obviously fair to determine transmission costs for the pipeline as a whole and not to compute them on a mileage demand basis. In that way the beneficiaries of the entire project share equitably in the cost. To allow the costs to accumulate the closer the gas gets to Denver would be to assume that the extension to Denver was a separate project on which the earlier customers were in no way dependent. These circumstances illustrate that considerations of fairness, not mere mathematics, govern the allocation of costs. Cf. *Wabash Valley Electric Co.* v. *Young,* 287 U. S. 488, 499. What we have said also answers Canadian's complaint that the wholesale sales in Texas for consumption in the towns of Dalhart, Hartley, and Texline, Texas, are burdened with too large a share of transmission costs. We can see in

this situation no difference between those customers and the ones located at more distant points on the pipeline.[5]

Colorado Interstate objects to that part of the Commission's treatment of transmission costs whereby it assigned 50% of the return to capacity costs and 50% to volumetric costs. The contention is that the entire return on the transmission facilities should be apportioned to capacity costs on the theory that the volumetric costs have no relation to the property required for meeting the maximum demands of the wholesale business and that the method employed departs from the requirements of a fair return on the property devoted to the public service. But, as we have seen, capacity costs were allocated to customers in the ratio that the Mcf sales to each customer on the system peak day bore to the total sales to all customers on that day. It is not apparent why direct industrial sales should carry a lighter share of the costs merely because their use of the pipeline may be less on the system peak day. As the Commission points out, if the method advanced by Colorado Interstate were used, the amount paid by the industrial customer for transportation of the gas through the pipeline would be measured not by the customer's use throughout the year, which might be substantial, but by its use on the system peak day which might be slight. In that event the industrial customer would obtain to an extent free transportation of gas.

Colorado Interstate also makes objection to the selection and use of February 9, 1939, as the system peak day and the allocation of the capacity cost component of the transmission costs on the basis of use on that day. It is argued that the mean temperature for that day was 8° Fahrenheit above zero, that much lower mean tempera-

---

[5] So far as appears Canadian presented no evidence showing the cost of these intrastate sales.

tures are experienced in the Colorado area, that as the temperature drops the load of resale gas rapidly increases, and that if these capacity costs were allocated on the basis of use during the coldest day the resale gas would carry a greater portion of them. We do not stop to develop the point. We have carefully considered Colorado Interstate's contention. As we read the record, if either of the days selected by Colorado Interstate were taken as the system peak days, there would be allocated to the industrial gas a larger portion of these capacity costs than the Commission allocated. On that showing we cannot say that the choice of February 9, 1939, was unfair.

Colorado Interstate and Canadian object to the Commission's use of the return. The Commission included in the total cost of service for these companies a $6\frac{1}{2}$ per cent return on the rate base.[6] In other words, the $6\frac{1}{2}$ per cent return was computed on the basis of all the property used by petitioners in their various classes of business—intrastate sales, direct industrial sales, and interstate wholesale sales.[7] Now it is apparent that if the reduction ordered was based on the excess of revenues from all classes of business over the aggregate costs, the result would be to reduce to a common level the profits from each class. In that case, whenever a company was making a higher return on its unregulated business than the rate of return allowed for the regulated business, the excess earnings from the unregulated part would be appropriated to the

---

[6] As we have said, the return on leases and wells was treated as volumetric costs; 50 per cent of the return on the Denver pipeline was treated as volumetric and 50 per cent as capacity costs; and return on investment in metering and regulating equipment was treated as distribution costs.

[7] As respects the accounting for the cost of money invested in the enterprise see Schlatter, Advanced Cost Accounting (1939), ch. XII; Neuner, Cost Accounting (1942), p. 277; Lawrence, Cost Accounting (1930), ch. 22.

entire business. When the unregulated business was being operated at a loss or at less than the return which was allowed, excess earnings from the regulated business would be appropriated to the unregulated business. A low rate might therefore be concealed by siphoning earnings from the unregulated business; a high rate might be built up by making the regulated business share the losses of the unregulated one.

It is said that that is what happened here. But that is not true. As we have seen, the Commission ordered a rate reduction based solely on the excess of revenues over costs (including return) derived from the regulated business. None of the excess revenues over costs (including return) from the unregulated business was included in that reduction. If the Commission in determining costs of the unregulated business had used a higher rate of return, it would have increased the costs of that business and reduced the excess revenues allocable to it. But since under the Commission's method of allocation the amount of that excess would not be reflected in the reduction ordered, there would be no difference in result.

The cases are presented as if the 6½ per cent allowed by the Commission on the rate base limits the earnings from the whole enterprise to 6½ per cent. That also is not true. The return merely measures the earnings allowed from the regulated business. As we have noted, the excess of earnings which Colorado Interstate makes from direct industrial sales (on the basis of 6½ per cent return) is $131,000 annually. The Commission pointed out (43 P. U. R. (N. S.) p. 230) that if Colorado Interstate "retains these earnings in excess of a 6½ per cent rate of return on its sales to these customers, its rate of return on its entire business is increased to approximately 8 per cent *after placing into effect the reductions in rates ordered herein.*"

Of the other objections made by Canadian and Colorado Interstate on this phase of the case, we need mention only

one.[8] It is contended that the findings of the Commission on the allocation of costs are inadequate and that the cases should be remanded to the Commission so that appropriate findings may be made. The findings of the Commission in this regard leave much to be desired since they are quite summary and incorporate by reference the Commission's staff's exhibits on allocation of cost. But the path which it followed can be discerned. And we do not believe its findings are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process. Cf. *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499; *United States* v. *Carolina Freight Carriers Corp.*, 315 U. S. 475.

*Canadian's Sales to Colorado Interstate.* The Commission ordered a blanket reduction of $561,000 in the sales price of all types of gas sold by Canadian to Colorado Interstate. A substantial part of that gas is sold to Colorado Interstate for resale to direct industrial customers. Canadian maintains that the Commission has no authority to fix the rate on the sale of that portion or class of gas to Colorado Interstate. Sec. 1 (b) of the Act, however, provides, as we have noted, that the provisions of the Act apply "to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use." Canadian, however, seeks support for its position in the declaration in § 1 (a) of the Act that "the business of transporting and selling natural gas for ultimate distribution to the public is

---

[8] It is objected that the allocation made by the Commission results in discrimination between purchasers of gas from Colorado Interstate as indicated by the fact that costs allocated to one customer who is distant from Denver are greater than costs allocated to another customer at Denver. But all the Commission did was to order an aggregate reduction in the wholesale rates of $2,065,000 so as to produce a fair return. The adjustment of the rate schedules for various delivery points has not yet been made. See *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 584.

affected with a public interest." But we find no warrant for saying that the words "ultimate distribution to the public" imply distribution to domestic users alone. Industrial users are as much a part of the "public" as domestic users and other commercial users. And the distribution to one is as "ultimate" as the distribution to the other. Moreover, that declaration of policy may not be used to take out of § 1 (b) of the Act the express provision subjecting to regulation gas sold for resale for "industrial use." Furthermore, the declaration of policy contained in § 1 (a) is not as narrow as Canadian suggests. For § 1 (a) goes on to say that federal regulation in matters relating to "the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." Sales for resale to industrial users is embraced in the broad sweep of that language. Canadian also seeks support for its position from the proviso in § 4 (e) of the Act that the Commission shall not have authority to suspend the rate "for the sale of natural gas for resale for industrial use only." Canadian infers from that provision that such rates are not subject to regulation by the Commission. The short answer, however, is that the authority of the Commission to suspend rates is restricted to rates over which it has jurisdiction. If the Commission had no authority over the rates in question, the proviso in § 4 (e) would be unnecessary. Accordingly, it seems clear that all of the gas sold by Canadian to Colorado Interstate for resale, including that sold for resale for industrial use, is subject to rate regulation by the Commission.

There is the further suggestion in Canadian's argument that since the Commission treated Canadian and Colorado Interstate as an integrated system for purposes of allocation of costs, it should have limited its rate reduction to those rates over which it would have jurisdiction if the two companies were in fact one. It is argued that in such event there would be no sales between Canadian and

Colorado Interstate and the latter's direct sales to industrial users would not be subject to the jurisdiction of the Commission. The difficulty is that Colorado Interstate purchases its gas from Canadian and the purchase price is the interstate wholesale rate which is an operating expense on which Colorado Interstate's resale rates are computed. Moreover, Canadian as required by § 4 (c) of the Act has its rate to Colorado Interstate in a rate schedule on file with the Commission. Unless and until a new rate schedule was filed or the old schedule changed by the Commission, that rate would have to be exacted by Canadian and paid by Colorado Interstate. § 4 (d). That rate therefore could hardly be maintained if Colorado Interstate were allowed as an operating expense a lesser amount for the gas it purchases from Canadian.

*Producing and Gathering Facilities.* Sec. 1 (b) which we have already quoted states that the provisions of the Act "shall not apply . . . to the production or gathering of natural gas." The Commission determined a rate base which includes Canadian's production and gathering properties as well as its interstate transmission system. The return allowed by the Commission was limited to 6½ per cent of the rate base so computed. The Commission made an allowance for working capital to enable Canadian to carry on its production and gathering operations. The Commission made an allowance for Canadian's operating expenses which included the cost of producing and gathering natural gas. The Commission applied its formula for allocation of costs to Canadian's production and gathering properties as well as to its other facilities. Thus Canadian contends that contrary to the mandate of § 1 (b) the Commission has undertaken to regulate the production and gathering of natural gas. Reliance for that position is sought from other provisions of the Act. It is pointed out that § 1 (a) declares that "the business of transporting and selling natural gas" for ultimate dis-

tribution to the public is affected with a public interest and that federal regulation "in matters relating to the transportation of natural gas and the sale thereof" in interstate commerce is necessary in the public interest. Transportation and sale do not include production or gathering. Other sections emphasize that distinction. Thus § 4 and § 5, the rate regulating provisions of the Act, refer to charges for the "transportation or sale of natural gas, subject to the jurisdiction of the Commission." Sec. 7 (a) relates to the extension or improvement of "transportation facilities"; § 7 (b) to the abandonment of "facilities subject to the jurisdiction of the Commission"; § 7 (c) to the construction or extension of facilities for the "transportation or sale of natural gas, subject to the jurisdiction of the Commission." It is pointed out that apart from § 1 (b) only a few sections of the Act refer to "production." Sec. 5 (b) gives the Commission power to investigate "the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas." This goes no further, it is said, than to aid state regulation. Sec. 9 (a) authorizes the Commission to ascertain and determine and by order fix "the proper and adequate rates of depreciation and amortization of the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas." Sec. 9 (a) further provides that no natural-gas company subject to the jurisdiction of the Commission shall charge to operating expenses "any depreciation or amortization charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation or amortization other than that prescribed therefor by the Commission." These are said, however, to be no more than accounting requirements and distinct from the

fixing of rates to be charged for public utility or transportation services. That distinction is emphasized, it is said, by the proviso in § 9 (a) that "Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any natural-gas company, the percentage rates of depreciation or amortization to be allowed, as to any class of property of such natural-gas company, or the composite depreciation or amortization rate, for the purpose of determining rates or charges." The provisions of § 10 (a) which give the Commission authority to require reports from natural-gas companies as to their assets and liabilities, the "cost of maintenance and operation of facilities for the production" of natural gas and the like are said to be mere information requirements quite consistent with the absence of power to regulate the production and gathering of natural gas.[9] See *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194. And the authority given the Commission by § 14 (b) is said merely to supplement the Commission's powers under sections of the Act. Sec. 14 (b) grants the Commission power to determine "the adequacy or inadequacy of the gas reserves held or controlled by any natural-gas company" and "the propriety and reasonableness of the inclusion in operating expenses, capital, or surplus of all delay rentals or other forms of rental or compensation for unoperated lands and leases." This is said to supplement the Commission's authority over the construction, extension, or abandonment of facilities or service under § 7, the determination of amortization rates under § 9 (a), and the accounting requirements of § 8.

Support for Canadian's position is also sought in the legislative history of the Act. It is pointed out that the

---

[9] Another section of the Act which refers to "production" is § 11 (a). It gives the Commission certain functions to perform where two or more States propose compacts dealing with the conservation, production, transportation, or distribution of natural gas.

declared purpose of the legislation was to occupy the field in which this Court had held the States might not act. See *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 609–610. And it is noted that Senator Wheeler, who sponsored the legislation in the Senate, said during the debate in answer to an inquiry whether the bill undertook to regulate the production of natural gas or the producers of natural gas: "It does not attempt to regulate the producers of natural gas or the distributors of natural gas; only those who sell it wholesale in interstate commerce." 81 Cong. Rec. p. 9312.

From these various materials it is argued that the Commission has no authority to include producing or gathering facilities in a rate base or to include production or gathering expenses in operating expenses. It is said that when the Commission follows that course, it regulates the production and gathering of natural gas contrary to the provisions of § 1 (b) of the Act. It is argued that the correct procedure is for the Commission to allow in the operating expenses of a natural-gas company, whose rates it is empowered to fix, the "fair field price" or "fair market value, as a commodity, of the gas" which finds its way into the transmission lines for interstate transportation and sale.

This is precisely the argument which West Virginia, appearing as *amicus curiae*, advanced in the *Hope Natural Gas Co.* case. We rejected the argument in that case. 320 U. S. pp. 607–615, particularly p. 614, n. 25. We have reviewed it here at this length in view of the seriousness with which it has been urged not only by Canadian but also by the Independent Natural Gas Association of America which appeared *amicus curiae*. But we adhere to our decision in the *Hope Natural Gas Co.* case and will briefly state our reasons.

A natural-gas company as defined in § 2 (6) of the Act is "a person engaged in the transportation of natural

gas in interstate commerce, or the sale in interstate commerce of such gas for resale." Canadian is such a company. It is plain therefore that the Commission has authority to fix its interstate wholesale rates. § 5. It is obvious that when rates of a utility are fixed the value of its property is affected. For as we stated in the *Hope Natural Gas Co.* case, value is "the end product of the process of rate-making not the starting point." 320 U.S. p. 601. When a natural-gas company which owns producing properties or a gathering system is restricted in its earnings by a rate order, the value of all of its property is affected. Congress of course might have provided that producing or gathering facilities be excluded from the rate base and that an allowance be made in operating expenses for the fair field price of the gas as a commodity. Some have thought that to be the wiser course. But we search the Act in vain for any such mandate. The Committee Report stated that the Act provided "for regulation along recognized and more or less standardized lines" and that there was "nothing novel in its provisions." H. Rep. No. 709, 75th Cong., 1st Sess., p. 3. Certainly the use of a rate base which reflects the property of the utility whose rates are being fixed has been customary. 2 Bonbright, Valuation of Property (1937) ch. XXX; Smith, The Control of Power Rates in the United States and England (1932), 159 Annals 101. Prior to the Act that method was employed in the fixing of the rates of gas, as well as electric, utilities. See *Willcox* v. *Consolidated Gas Co.,* 212 U.S. 19; *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U.S. 655; *Newark Natural Gas & Fuel Co.* v. *Newark,* 242 U.S. 405; *Railroad Commission* v. *Pacific Gas & Electric Co.,* 302 U.S. 388; *Lone Star Gas Co.* v. *Texas,* 304 U.S. 224. We do not say that the Commission lacks the authority to depart from the rate-base method. We only hold that the Commission is not precluded from using it. There are ample indications throughout the Act to sup-

port that view. Sec. 6 (a) empowers the Commission to investigate and ascertain the "actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property." As we have noted, § 9 (a) gives the Commission authority not only to require natural gas companies to carry proper and adequate depreciation and amortization accounts but also to fix such rates for "the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas." And § 14 (b), as already stated, not only gives the Commission authority to determine the adequacy or inadequacy of gas reserves of a natural-gas company but also empowers it to determine the "propriety and reasonableness of the inclusion in operating expenses, capital, or surplus of all delay rentals or other forms of rental or compensation for unoperated lands and leases." Sec. 9 (a) and § 14 (b), though designed not to limit the power of state regulatory agencies, plainly were designed to aid the Commission in its rate-making functions. These provisions [10] all suggest that when Congress designed this Act it was thinking in terms of the ingredients of a rate base, the deductions which might be made, and the additions which were contemplated. No exclusion of property used or useful in *production* of natural gas was made. That type of property was not singled out for special treatment; it was treated the same as all other property. We must read § 1 (b) in the context of the whole Act. It must be reconciled with the explicit provisions which describe the normal conventions of rate-making.

That does not mean that the part of § 1 (b) which provides that the Act shall not apply "to the production or gathering of natural gas" is given no meaning. Certainly

[10] §§ 5 (b), 6 (a), 9 (a), 10 (a), and 14 (b).

that provision precludes the Commission from any control over the activity of producing or gathering natural gas. For example, it makes plain that the Commission has no control over the drilling and spacing of wells and the like. It may put other limitations on the Commission. We only decide that it does not preclude the Commission from reflecting the production and gathering facilities of a natural gas company in the rate base and determining the expenses incident thereto for the purposes of determining the reasonableness of rates subject to its jurisdiction.

That treatment of producing properties and gathering facilities has of course an indirect effect on them. As we have said, rate-making like other forms of price fixing may reduce the value of the property which is being regulated. *Federal Power Commission* v. *Hope Natural Gas Co., supra,* p. 601. But that would be true whether or not a rate base was used. Canadian would be the first to object if the gas which it owns was given no valuation in these proceedings. Obviously it has value. The Act does not say that the Commission would have to value it at the fair field price if the Commission abandoned the rate-base method of regulation. We held in the *Hope Natural Gas Co.* case that under the Act it is "the result reached not the method employed which is controlling. . . . It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." 320 U. S. p. 602. If the Commission followed Canadian's method, excluded the producing properties and gathering facilities from the rate base, valued the gas at a price which would reduce the earnings to the level of the present order, the effect on the producing properties and gathering facilities would be precisely the same as in the present case. Since there is no provision in the Act which would require the Commission to value the gas

at the price urged by Canadian, the problem on review would be whether the end result was unjust and unreasonable. The point is that whatever method for rate-making is taken the fixing of rates affects the value of the underlying property. Hence § 1 (b) could be read as petitioners read it only if Congress had put a floor under producing properties and gathering facilities and fixed a minimum return on them.

These considerations lead us to conclude that § 1 (b) does not prevent the Commission from taking into account the production properties and gathering facilities of natural gas companies when it fixes their rates.

*Original Cost of Production and Gathering Facilities.* The Commission found the actual legitimate cost of Canadian's property, including its producing properties and gathering facilities, to be $10,784,464 as of December 31, 1939. It deducted $2,134,629 for accrued depreciation and depletion. It added $150,738 for working capital and $571,923 for gross plant additions to December 31, 1941. The result was a rate base of $9,372,496 which the Commission rounded to $9,375,000. The Commission rejected estimates of reproduction cost new less observed depreciation because they were "too conjectural to have probative value" and adopted original cost as "the best and only reliable evidence as to property values." 43 P. U. R. (N. S.) pp. 213, 214. Canadian maintains that if its leaseholds are to be included in the rate base, it was improper to value them as the Commission did. Canadian offered evidence that their present market value was much higher. It also offered evidence of a commodity market value of natural gas per Mcf which would give a much higher value to the production phase of Canadian's business. We do not stop to develop the details of these lines of evidence. We cannot say that the Commission was under a duty to put the leaseholds into the rate base at the valuation urged by Canadian unless we revise what we said in

*Federal Power Commission* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 586, and overrule *Federal Power Commission* v. *Hope Natural Gas Co., supra.* We held in those cases that the Commission was not bound to the use of any single formula in determining rates. And in the *Hope Natural Gas Co.* case we sustained a rate order based on actual legitimate cost against an insistent claim that the producing properties should be given a valuation which reflected the market price of the gas. In those cases we held that the question for the courts when a rate order is challenged is whether the order viewed in its entirety and measured by its end results meets the requirements of the Act. That is not a standard so vague and devoid of meaning as to render judicial review a perfunctory process. It is a standard of finance resting on stubborn facts.[11] "From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 345–346. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Public Service Commission,* 262 U. S. 276, 291 (Mr. Justice Brandeis concurring)." *Federal Power Commission* v. *Hope Natural Gas Co., supra,* p. 603.

Hence, we cannot say as a matter of law that the Commission erred in including the production properties in the rate base at actual legitimate cost. That could be de-

---

[11] Cf. the British standards described in Smith, The Control of Power Rates in the United States and England, 159 Annals 101, 103, 104.

termined only on consideration of the end result of the rate order, a question not here under the limited review granted the case.

*Cost to Canadian's Affiliate.* As we have seen, Canadian and Colorado Interstate had their origin in an agreement made in 1927 between Southwestern, Standard, and Cities Service. Pursuant to that agreement Southwestern organized Canadian, a wholly owned subsidiary, to which were transferred the gas leaseholds and producing property owned by Amarillo, a wholly owned subsidiary of Southwestern. The cash consideration for this transfer was $5,000,000, which was advanced by Standard at 6 per cent interest. Colorado Interstate was organized by Standard to construct and operate the pipeline to connect with Canadian's facilities and to transport the gas to the Denver market and intermediate points.

Canadian issued $11,000,000 of 6% twenty-year bonds to finance its portion of the total project. Colorado Interstate purchased those bonds with part of the proceeds of $19,200,000 of its own 6% twenty-year sinking fund bonds which Standard had purchased at par. Canadian repaid the $5,000,000 advance made by Standard out of the proceeds of the sale of its bonds to Colorado Interstate. Canadian's stock was issued to Southwestern and is carried on Canadian's books at $1.00. Canadian entered into a "cost" contract with Colorado Interstate whereby Canadian agreed to produce and sell gas to Colorado Interstate at "cost" for twenty years which might be extended by Colorado Interstate. Under the contract, "cost" included Canadian's operating expenses, interest at 6%, and amortization (in lieu of depreciation, depletion and retirements) of all of Canadian's indebtedness over the twenty-year period. It was also provided that Canadian's "cost" under the contract should be decreased by any profits which it might obtain from other sources including any local sales. Thus it was obvious that Canadian under

this "cost" contract would have no profits available for dividends on its stock.

But in accordance with the agreement Colorado Interstate issued $2,000,000 par value 6% preferred stock and 1,250,000 shares of no par common. Cities Service received 15% of the common stock. The rest of the common stock and all of the preferred was divided equally between Southwestern and Standard. The latter paid $2,000,000 in cash for its share of preferred and common. Southwestern received not only preferred and common stock, but also $5,000,000 in cash from the proceeds of the $11,000,000 of bonds which Canadian issued and which were to be amortized over twenty years as part of the "cost" of gas sold to Colorado Interstate by Canadian.

Canadian contends that the Commission should have included $5,000,000 in the rate base for the gas leases and producing properties acquired from Amarillo. The original cost of the properties to Amarillo was $1,879,504. That is all the Commission allowed. It said, "Any treatment which would permit the capitalization of such amounts would open the door to the renewal of past practices of the utility industry when properties were traded between affiliated interests at inflated prices with the expectation that the public would foot the bill." 43 P. U. R. (N. S.) p. 215. We agree. Southwestern owned the producing properties at the beginning of the transaction through one subsidiary; it owned them at the end of the transaction through another subsidiary. As between Southwestern and its subsidiaries there was no more than an intercompany profit. If Amarillo rather than Canadian had entered the project, had sold a bond issue to Southwestern and with part of the proceeds paid off a $5,000,000 loan to Standard, certainly the amount of that payment would not be properly included in its rate base. We fail to see a difference in substance when another wholly owned subsidiary is utilized by Southwestern.

The fact that the negotiations between Southwestern and Standard were at arm's length has no bearing on the present problem. The end result is that property has been transferred at a write-up from one of Southwestern's pockets to another. The impact on consumers of utility service of write-ups and inflation of capital assets through intercompany transactions or otherwise is obvious. The prevalence of the practice in the holding company field gave rise to an insistent demand for federal regulation. See S. Doc. No. 92, Pt. 84–A, 70th Cong., 1st Sess., Utility Corporations, Final Report of the Federal Trade Commission (1936); Bonbright & Means, The Holding Company (1932), ch. VI; Barnes, The Economics of Public Utility Regulation (1942) pp. 95 *et seq.*

*American T. & T. Co.* v. *United States*, 299 U. S. 232, is not opposed to our position. It merely indicates a proper treatment for an intercompany transaction where in fact an additional investment is shown to exist.

*Affirmed.*

MR. JUSTICE ROBERTS and MR. JUSTICE REED dissent from so much of the opinion as approves the allocation by the Commission of investments and expenses to the non-regulable transmission properties. They concur in the dissent of the CHIEF JUSTICE in *Canadian River Gas Co.* v. *Federal Power Commission, post,* p. 615.

MR. JUSTICE JACKSON, concurring.

I concur in upholding orders of the Federal Power Commission in this and companion cases. The Court cannot, consistently with *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, do otherwise.

The opinion in the *Hope* case laid down fundamental principles of decision in this language: "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is con-

trolling. . . . It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Federal Power Commission* v. *Hope Natural Gas Co., supra,* 602. This case introduced into judicial review of administrative action the philosophy that the end justifies the means. I had been taught to regard that as a questionable philosophy, so I dissented and still adhere to the dissent. But it is the law of this Court, and I do not understand that any majority is ready to reconsider it.

It is true that the Act excludes "production or gathering of natural gas" from jurisdiction of the Commission. If the Commission had imposed any direct regulation upon that activity, I would join in holding it to have exceeded its jurisdiction. But the orders in question have no immediate "impact" upon production or gathering of gas.

The statute commands the Commission to regulate the price of natural gas transported and sold at wholesale in interstate commerce for resale. The Commission has investigated the fiscal aspects of production and gathering because of their bearing on the reasonableness of interstate rates. I suppose a commission is free to take evidence as to conditions and events quite beyond its regulatory jurisdiction where they are thought to affect the cost of that whose price it is directed to determine. This, as I see it, is all that has been done here.

Of course the Commission's order, whose primary impact is on rates in the interstate markets, has a very important secondary effect on production and on producers of gas. As the industry is organized the Commission could not fix an interstate price that would not have some such reaction. Indeed, I think the Commission cannot wisely

fix a reasonable price without considering its incidental effect on production.

To let rate-base figures, compiled on any of the conventional theories of rate-making, govern a rate for natural gas seems to me little better than to draw figures out of a hat. These cases confirm and strengthen me in the view I stated in the *Hope* case that the entire rate-base method should be rejected in pricing natural gas, though it might be used to determine transportation costs. These cases vividly demonstrate the delirious results produced by the rate-base method. These orders in some instances result in three different prices for gas from the same well. The regulated company is a part owner, an unregulated company is a part owner, and the land owner has a royalty share of the production from certain wells. The regulated company buys all of the gas for its interstate business. It is allowed to pay as operating expenses an unregulated contract price for its co-owner's share and a different unregulated contract price for the royalty owner's share, but for its own share it is allowed substantially less than either. Any method of rate-making by which an identical product from a single well, going to the same consumers, has three prices depending on who owns it does not make sense to me.

These cases furnish another example of the capricious results of the rate-base method in this kind of case. The Commission has put five of the most important leaseholds, containing approximately 47,000 acres, in the rate base at $4,244.24, something under 10 cents per acre. Three such leases are put in the rate base at zero. This is because original cost was used, and these were bought before discovery of gas thereon. The Company which took the high risk of wildcat exploration is thus allowed a return of 6½ per cent on nothing for the three leases and a return of less than $300 a year on the others. Their present

market value is shown by testimony to be over 3 million dollars.

I cannot fairly say that the Commission exceeded its jurisdiction in obtaining this evidence and making these calculations, even though the evidence related to production and gathering of gas. But I do think it is a fantastic method of fixing a "just and reasonable" price for gas.[1] All of that, however, was thrashed out in the *Hope* case.

I do not recede from the views therein stated that *Hope* provides no workable basis of judicial review, no key by which commissions can anticipate what rule, if any, will control our review, and no guidance to counsel as to what issues they should try or how they should try them. I think, however, that the majority which promulgated that decision, or a majority of that majority, should be permitted to continue to spell out its application to specific problems until we see where it leads.

It is difficult for me in these cases, and in some it might be impossible, to follow the rule of *Hope* in reaching a decision. I have no intuitive knowledge as to whether a given price is reasonable, and my fundamental concept of reasonable price in this industry and how to find it has been rejected by the Court. But it happens that this case illustrates some aspects of the problem of pricing gas, as will appear from the reasons I shall state for the failure of the Company in this case to convince me that it is wronged by the reduction of prices ordered by the Commission.

---

[1] It does not help me to know what is a reasonable price for gas to learn what it does to outstanding securities. Many gas companies were organized and operated in care-free days when they issued stocks and bonds without supervision. It does not prove that a gas rate is too low to show that it does not pay dividends on inflated values. Nor is a rate proved excessive by the fact that it pays a large dividend upon an exceedingly conservative capitalization. I think *Hope's* use of return on stock or bond issues, repeated in these cases, is one of the least reliable of possible tests of rates.

Far-sighted gas-rate regulation will concern itself with the present and future, rather than with the past, as the rate-base formula does. It will take account of conditions and trends at the source of the supply being regulated. It will use price as a tool to bring goods to market—to obtain for the public service the needed amount of gas. Once a price is reached that will do that, there is no legal or economic reason to go higher; and any rate above one that will perform this function is unwarranted. If the supply comes from a region where there is such overproduction that owners are ready to sell for less than a fair return on their investment, there is no reason why the public should pay more. On the other hand, if the supply is not too plentiful and the price is not a sufficient incentive to exploit it and fails to bring forth the quantity needed, the price is unwisely low, even if it does square perfectly with somebody's idea of return on a "rate base." The problem, of course, is to know what price level will be adequate to perform this economic function.

This case throws light on a subject which in *Hope* I was trying to discuss more abstractly. The evidence here shows facts from which we can learn, in the way any practical buyer would seek to learn, at which price this company is able, willing, and ready to bring gas into the interstate wholesale market. It is what might be called the most-favored-customer test, a test of course not available in a fully regulated industry but peculiarly adapted to the conditions of the natural gas industry as it has developed. This petitioner, Colorado Interstate Gas Company, sells to Colorado Fuel and Iron Company a large quantity of gas for industrial use. Its consumption approximates that of all the inhabitants of Denver. Colorado Fuel and Iron used in plants 7,257,379 m. c. f.'s, while Denver was supplied for public service 6,196,882 m. c. f.'s. The rates to the Fuel and Iron Company are not and never have been regulated by public authority. In May 1938,

the Gas Company contracted to extend the Fuel and Iron supply contract for five years at 9½ cents per m. c. f. for boiler fuel and 16 cents per m. c. f. for other purposes. The same gas is sold wholesale by the same company at the Denver city gate to the local distributing company at 40 cents per m. c. f.

Of course differences in conditions of delivery must be allowed for. Gas from the field is transmitted roughly 200 miles from the field to Colorado Fuel and Iron and about another 100 miles to Denver. If 50 per cent more transportation added 50 per cent to the entire price of the Fuel and Iron Company gas, which would mean attributing a zero value to it in the field and its entire selling price to transportation, it would bring gas to the city gate of Denver at about 14 cents based on boiler gas and 24 cents based on other gas, instead of the 40 cents being charged.

Another difference must be allowed for. The Denver public service has priority over the industrial gas in time of shortage. This is an impressive legal advantage, but one whose real worth depends on the number and duration of interruptions it causes in actual practice. From the tabulation of reductions and suspensions of service the Fuel and Iron Company appears to have suffered 5 interruptions from 1932 to December 31, 1940—the shortest for fifteen hours, the longest for fifty hours. I do not belittle these interruptions—they may be very costly to an industrial customer—but nothing indicates that they account for any such difference in price as we have here.

There is every indication that the Colorado Fuel and Iron price was really a bargained one. The Gas Company's position seems to have been the same as that stated by one of the witnesses in the Panhandle case, "It may be heresy to say so but we try to charge our nonregulated customers all the traffic will bear." This may have been candor; it is not heresy. Such is the normal spirit of the market place. But the record shows that Colorado Fuel

and Iron was not at the mercy of the Gas Company, was bargaining at arm's length, had a good bargaining position. It had been using other fuels and. the Gas Company had to bid for its business as against fuel competition. Under this pressure the Gas Company was able, ready, and willing to part with its gas, delivered 200 miles from the field, at 9½ to 16 cents per m. c. f.

What about the Denver rate? There the local distributing company, which was the purchaser, was a subsidiary of Cities Service, one of the three companies that owned the pipe line and gas supply and were the sellers of the gas. That local company had been distributing manufactured gas, by comparison with which 40-cent natural gas would look cheap, and is cheap. It is not necessary to draw any invidious inferences from intercorporate relationships to conclude that the 40-cent rate at the Denver gate was not a vigorously bargained one and was not much influenced by competitive considerations. The great economic advantages of natural gas to householders and the relative wastefulness of its industrial use are developed in my opinion in *Hope*.

I strongly suspect from the history of this transaction that there is an explanation of the difference in price— one which is not an uncommon argument used to justify a lower price to industrial than to household users. To supply Denver required laying a 20-inch pipe line, requires operating it, and requires most of the overhead of the business. To carry the additional Fuel and Iron business required only to lay the first 200 miles of pipe of 22-inch diameter instead of 20, and the additional revenue from industrial sales does not add the same proportion of capital investment, overhead, or operating expense. Thus, charging to Denver and other wholesale purchasers for resale to the public no more than would be charged if that service stood alone, the Company may justify its industrial

sales at low rates as good business from petitioner's management point of view.

But I do not think it can be accepted as a principle of public regulation that industrial gas may have a free ride because the pipe line and compressor have to operate anyway, any more than we can say that a big consumer should have a free ride for his coal because the trains run anyway. It is true that the Natural Gas Act forbids discrimination only as between regulated rates and does not forbid discriminations between the regulated and unregulated ones. 15 U. S. C. § 717c (b). But I do not think it precludes use of a voluntary, fairly bargained selling price as a standard of what is a "just and reasonable" price. By use of the unregulated price as a basis for comparison I think a reduction in the wholesale rates for resale to the public is in order. If this makes low price industrial business less desirable, it will be in the long-range public interest for reasons more fully stated by me in *Hope*.

I should like to reverse this case, not because I think the rate reduction is wrong, but because I think the real inwardness of the gas business as affects the future has been obscured by the Commission's preoccupation with bookkeeping and historical matter. Such considerations may be relevant to rate-base theories, but will not be very satisfying to a coming generation that will look back and judge our present regulatory method in the light of an exhausted and largely wasted gas supply. But as the matter stands I see no legal grounds for reversal.

MR. CHIEF JUSTICE STONE, dissenting in No. 380.

MR. JUSTICE ROBERTS, MR. JUSTICE REED, MR. JUSTICE FRANKFURTER and I are of opinion that the Federal Power Commission, in making the rate order here under attack, exceeded its jurisdiction and reached a result which must be rejected because unauthorized by the applicable statute.

In fixing rates for petitioner's interstate business of transporting and selling natural gas for resale, the Commission included petitioner's gas wells and gas gathering facilities together with all its transportation and distribution facilities in a single rate base. It valued the wells and gathering facilities at their prudent investment cost of many years ago, a valuation drastically less than their present market value. It then restricted petitioner's return to $6\frac{1}{2}\%$ of the rate base, including the wells and production facilities, constituting approximately two-thirds of the total rate base. It thus subjected petitioner's production and gathering property to the same regulation as that which the statute imposes upon petitioner's property used and useful in the interstate transportation and sale of gas for resale. This, we think, the Natural Gas Act in plain terms prohibits.

The Natural Gas Act of 1938, 52 Stat. 821, 15 U. S. C. § 717, *et seq.*, as amended February 7, 1942, 56 Stat. 83, declares, § 1 (a): "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and . . . Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." In the execution of this policy §§ 4 and 5 of the Act set up a complete scheme of regulation of rates and charges for the transportation and sale of natural gas by "natural gas companies" at wholesale in interstate commerce. Section 2 (6) defines a natural gas company as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." Section 1 (b) provides: "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale . . ., but shall not apply to any

other transportation or sale of natural gas ´. . . or to the production or gathering of natural gas."

The Court rejects petitioner's contentions that these provisions preclude the Commission from including the gas wells and gathering facilities in the rate base for petitioner's regulated business; that regulation begins only with the delivery of gas into petitioner's transmission pipe line and includes, as the statute provides, only the interstate transportation and sale of the gas for resale. Petitioner insists that, since the wells and gathering facilities are not subject to Commission regulation, the cost or value of the gas upon its delivery to petitioner's transmission line must, for purposes of rate regulation of the regulated business of transportation and sale, be taken at its fair market value.

This issue is now for the first time presented to this Court for decision. No such question was raised or decided in *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 610–614. Although it was mentioned in the amicus brief of the State of West Virginia, which was not a party to the suit, no such issue was raised by the parties in the case. There the gas wells and gathering property were included in the rate base valued at its prudent investment cost, and the allowed return was restricted to 6½%. But no objection was taken to the inclusion of the production property in the rate base, either in the Circuit Court of Appeals or, so far as the record shows, in the application to the Commission for rehearing. Section 19 (b) provides that no objection to the Commission's order may be considered by the court unless raised in the application to the Commission for rehearing. The production property having been included in the rate base without objection, we could consider only the question which was raised with respect to property admitted to be properly a part of the rate base, namely, whether its valuation by the Commission and the allowed

rate of return were within constitutional limits. Cf. *Cohens* v. *Virginia,* 6 Wheat. 264, 399.

· The Act speaks in terms of activities which are regulated and those which are not. It subjects the interstate transportation and sale of natural gas, an activity, to the jurisdiction of the Commission, which includes the exercise of its rate-making function as prescribed by §§ 4 and 5, and which concededly extends to the valuation of property used in interstate transportation and sale of natural gas and to the determination of a fair rate of return upon that value.

Even though production and gathering could be thought to be a part of the regulated transportation and sale, that possibility is precluded by the words of § 1 (b) which say: "The provisions of this Act [including those of §§ 4 and 5 which prescribe rate making for the activity of transporting and selling wholesale] shall not apply" to another activity, "the production or gathering of natural gas."

It does not seem possible to say in plainer or more unmistakable language that the one activity, interstate transportation and sale, is to be subjected to, and that the other, production or gathering, is to be excluded from, the valuation and rate-making powers of the Commission. To interpret the words "production or gathering" in § 1 (b) in the only way which the Court or the Government is able to suggest, as referring only to the physical activities of drilling and spacing the gas wells, and thus excluding such activities alone from regulation, seems hardly plausible. It is true that "production or gathering" are activities which may include the drilling and spacing of gas wells. But the "transportation and sale" referred to in the phrase of § 1 (b) "but shall not apply to any other transportation or sale of natural gas . . . or to the production or gathering of natural gas," is also an activity. Yet the Court and the Government concede that by the command of the Act

that it "shall not apply" to the activity of "any other transportation or sale," petitioner's property used in the transportation and sale of gas to industrial consumers is excluded from the rate base. They thus reach the surprising conclusion that property used in one sort of activity to which the provisions of the Act are declared not to apply, may nevertheless be included in the rate base, while holding that another sort of property, also used in an activity to which the provisions of the Act are by the same phrase declared not to apply, is nevertheless excluded from the rate base.

Nor is the plausibility of the Government's construction aided by reference to the provisions of the Act[1] giving the Commission power to make investigations, to regulate accounts, to gather information and to find values of property of natural gas companies and their depreciation. These provisions are obviously directed at aiding the Commission in the exercise of various powers which are conferred upon it but which are unrelated to the regulation of the production or gathering of natural gas. Section 5 (b), for example, authorizes the Commission to procure the information of costs of production or transportation of

---

[1] Section 5 (b) authorizes investigation by the Commission of the cost of production of natural gas, where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas. Section 6 (a) empowers the Commission to ascertain the cost of the property of every natural gas company and other facts bearing on the determination of such cost "when found necessary for rate making purposes." Section 9 (a) authorizes the Commission to determine the proper "rates of depreciation and amortization" of the several classes of property of each natural gas company "used or useful in the production, transportation, or sale of natural gas." Section 10 (a) gives the Commission authority to require reports from natural gas companies of their "cost of maintenance and operation of facilities for the production" of natural gas. Section 14 (a) gives the Commission power to determine the "adequacy or inadequacy of the gas reserves held or controlled" by them.

natural gas in aid of state commissions, and such was its purpose. H. Rep. No. 709, p. 5, 75th Cong., 1st Sess., on H. R. 6586. Sections 9 (a) and 10 (a) give authority essential to the Commission's admitted power to regulate the interstate sale of gas at wholesale, to determine whether the cost of or charge for the gas acquired by a natural gas company, whose rates are regulated, are excessive because unrelated to fair or market value, especially where the relations between the producer and the interstate wholesale distributor are not at arm's length. *United Fuel Gas Co.* v. *Railroad Comm'n,* 278 U. S. 300, 320; *Smith* v. *Illinois Bell Tel. Co.,* 282 U. S. 133, 144; *Western Distributing Co.* v. *Public Service Comm'n,* 285 U. S. 119; *Dayton Power Co.* v. *Public Utilities Comm'n,* 292 U. S. 290; *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 306–308; *Arkansas Gas Co.* v. *Dept.,* 304 U. S. 61; cf. *Interstate Commerce Comm'n* v. *Goodrich Transit Co.,* 224 U. S. 194, 211. And the determination of the Commission permitted by § 14 (a) with respect to the amount of gas reserve is essential to the determination of the rate of depreciation and amortization of the gas company's regulated transmission line, since its useful life is normally limited by the available gas supply.

No reason, founded upon the language of the statute or its purpose, is advanced for disregarding the plain command of § 1 (b) excluding the production or gathering of the gas from those other activities, the transporting and selling, which are subject to the regulatory provisions of §§ 4 and 5. The language was well chosen to accomplish exactly what the legislative history shows was intended to be accomplished. The report of the House Committee (H. Rep. No. 709, 75th Cong., 1st Sess.), recommending adoption of the bill which became the Natural Gas Act, shows beyond doubt that the purpose of the legislation was to bring under federal regulatory control the interstate transportation and sale of natural gas which had

been held not to be subject to state regulation, in *Missouri*
v. *Kansas Gas Co.*, 265 U. S. 298; cf. *Public Utilities
Comm'n* v. *Attleboro Co.*, 273 U. S. 83, but to leave undis-
turbed all other matters which were then subject to state
regulation, which included rate-making for production
and gathering. See *Illinois Natural Gas Co.* v. *Central
Illinois Co.*, 314 U. S. 498, 506; *Federal Power Comm'n* v.
*Hope Natural Gas Co., supra*, 609. And upon the floor of
the Senate the sponsor of the bill declared: "It does not
attempt to regulate the producers of natural gas or the
distributors of natural gas; only those who sell it whole-
sale in interstate commerce." 81 Cong. Rec., p. 9312.
That the exemption of the production of natural gas from
regulation was thought by the regulatory authorities
themselves to exclude regulation, by the Commission, of
the price of gas in the producing field, appears from the
hearings upon the predecessor bill,[2] which contained pro-
visions identical with or substantially equivalent to §§ 5
(b), 6 (a), 9 (a), and 10 (a) of the Act as finally passed,
and § 1 (b) of which declared that the provisions of the
bill should not apply "to the production of natural gas."

---

[2] In the hearings upon the earlier bill, Mr. DeVane, Solicitor of the
Federal Power Commission, stated: "Section 1 (b) also provides that
the Commission shall have no jurisdiction over the gathering or gather-
ing rates for natural gas." "Gathering rates," he explained as "The
rates that are paid in the gathering field." He further stated, "There
is no control of the gathering rate; the Commission would not have
jurisdiction. That price is fixed by competitive conditions that exist
in the field." He said that the Commission does not have any power
over the price "that is paid to the gatherer, to the man that produces
it; that is binding if the transaction is at arm's length. If the trans-
action is not at arm's length, of course, its reasonableness may be
inquired into, under the decisions of the Supreme Court." There is
nothing in the subsequent legislative history to indicate that this
understanding with respect to § 1 (b) in the earlier Act was changed
at a later stage, and § 1 (b) as finally adopted indicates no such
change. Hearings on H. R. 11662, 74th Cong., 2d Sess., pp. 28, 42–3.

The exclusion of production and gathering of natural gas from the regulatory authority of the Commission is a command to the Commission not to regulate that which is excluded. Otherwise powers reserved to the states would be encroached upon contrary to the words and purpose of the Act, and a pretended government would be set up by Commission action, without the authority of Congress.

The Commission did not deny the command, but justified disregard of it only by saying that "Canadian's production and gathering operations are an integral part of its total operations, including transportation in interstate commerce and the sale of natural gas for resale in interstate commerce." And it added: "The investigation of Canadian's production and gathering property and operations is indispensable in regulating Canadian's rates and charges for the sale of natural gas in interstate commerce for resale." Such an investigation was undoubtedly proper and necessary in order to ascertain the fair unregulated value of the natural gas produced in an unregulated field, on its delivery into petitioner's transmission pipe line, in order to enable the Commission to regulate appropriately the sales price of the gas.

But this does not mean that in fixing rates for a regulated business which derives its distributed product from an unregulated business that the property of the latter is not to be segregated from the regulated property, or that there can rightly be applied to it standards of valuation and rate of return which are applicable only to a regulated business. *Interstate Commerce Comm'n* v. *Goodrich Transit Co., supra,* 211; *Smith* v. *Illinois Bell Tel. Co., supra,* 151; *Western Distributing Co.* v. *Public Service Comm'n, supra,* 123–124. Otherwise its exclusion from regulation would be meaningless. The standards to be applied in order to make certain that the regulated business is not paying too much for the product are those which

currently apply in the unregulated business. This, as we have pointed out, was recognized by the Solicitor of the Commission in the hearings on proposed legislation culminating in the present Act. He said that the unregulated field price was controlling upon the Commission "if the transaction is at arm's length. If the transaction is not at arm's length, of course, its reasonableness may be inquired into, under the decisions of the Supreme Court." [3]

It is one thing to say that such investigation is necessary to ascertain the fair unregulated value of petitioner's gas when produced. But it is quite another to say, and the Commission did not say, that it is necessary or permissible for the Commission to fix the value of petitioner's production property and the gas which it produces far below their market value, and to restrict petitioner's return from its unregulated business below that which would be produced if the gas production were unregulated. Such restrictions can be justified only by authorized rate regulation. From such regulation petitioner's gas wells and production facilities have been specifically exempted by command of the statute.

Where a regulated utility procures from an unregulated source the product which it distributes, the proper cost which the regulated company should be allowed to pay for it, when the Commission is not authorized to regulate the production, presents a problem not free from difficulties. But here the Commission has made no effort to meet these difficulties, if such there be, except by the one course which the statute forbids, by subjecting the production property to regulation.

A familiar and permissible way of meeting them, as petitioner points out, is by treating the property unregulable in law as unregulable in fact, and applying to it those standards of value and return which currently

---

[3] See footnote 2, *supra*.

prevail in an unregulated business when it is conducted at arm's length. Petitioner urges that there are other courses open to the Commission which will not violate the statute, and that there is uncontradicted evidence in the record showing that natural gas has a market value at the wellhead and at the point of delivery into petitioner's transmission line. Those conditions would indicate that gas production property in the area in question has an ascertainable market value on which, in the absence of regulation, petitioner is free to receive the return currently produced by such property.

Without an appropriate investigation we cannot know the fact, which is for the Commission and not for us to determine. If investigation discloses difficulties which only legislation can cope with, the answer is further legislation, not disregard of existing legislation. But the Commission has made no such determination or investigation and, so far as appears, has given no consideration to the evidence supporting petitioner's contentions. It is the duty of the Commission so to conduct its proceedings as to restrict its action within the jurisdiction conferred upon it. It is plain that it has not performed that duty here, and that it should be required to do so. Whether the facilities for the production of natural gas should be regulated and, if so, whether the regulation should be left to the states, as we think Congress has left it, are matters for Congress to determine. If it be thought that petitioner's profits from production of gas are too great because they are unregulated, and if it be thought to be important that they be reduced, it is immensely more important that that be not accomplished by lawless action.

It is no answer to cite our authorities involving state regulation,[4] in order to prove that the Commission here

[4] *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19; *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U. S. 655; *Newark Natural Gas Co.* v.

has acted within its statutory authority. In reviewing such cases we accept the state's construction of its statutes fixing the jurisdiction of state regulatory bodies. Nor is it any justification of the Commission's action to say, applying the *Hope* case, that the end result of the Commission's action is that petitioner's unregulated property is not being confiscated. Authorized utility regulation may, of course, result in a permissible diminution of property values and income, provided the regulation does not so exceed constitutional limitations as to be "confiscatory." Hence, loss or damage caused by authorized utility regulation gives rise to no actionable wrong if the regulation is within constitutional limitations. Such was the principle laid down in the *Hope* case.

But any such diminution in value or return, caused by unauthorized regulation, is unlawful without reference to constitutional principles. In the *Hope* case there was no contention that the utility's production property was not subject to regulation. The only question was whether the return upon it, as allowed by statutory authority, was confiscatory because it went beyond the constitutional limits of the power to regulate. Here the question is only of the deprivation of petitioner's property by the Commission's action in excess of its statutory power to regulate. That power, in the case of petitioner's production property, we think does not exist. So far as the unauthorized regulation deprives petitioner of its property, the deprivation cannot be justified by saying that, if authorized, it would not violate the Constitution. Absence of confiscation by authorized Commission regulation does not prove that the Commission has legislative authority to regulate.

*Newark,* 242 U. S. 405; *Public Utilities Comm'n* v. *Landon,* 249 U. S. 236; *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23; *Railroad Commission* v. *Pacific Gas & Electric Co.,* 302 U. S. 388; *Lone Star Gas Co.* v. *Texas,* 304 U. S. 224.