**PORT NORRIS EXPRESS CO., INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Dennis Trucking Company, Inc., Intervenor.**

No. 81–2884.

United States Court of Appeals, Third Circuit.

Argued July 23, 1982.

Decided Sept. 8, 1982.

William P. Jackson, Jr. (argued), David C. Reeves, Arlington, Va., for petitioner; Jackson & Jessup, P. C., Arlington, Va., of counsel.

John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel (argued), Washington, D. C., for I. C. C.

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case is one of several brought in this Court by Port Norris Express Company, Inc. (Port Norris), challenging what it claims to be excessively broad authorizations granted to competing carriers by the Interstate Commerce Commission (ICC). In three previous cases, No. 81–2589, No. 81–2640, and No. 81–2641, all entitled *Port Norris Express Co., Inc. v. Interstate Commerce Commission*, the ICC did not defend its grants of authority but instead asked this Court to remand in light of *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452 (5th Cir. 1981) (*ATA* I). *ATA* I, discussed *infra* pp. 806–808, was a general challenge by trade associations, a union, and several trucking firms to ICC rules and policies implementing the Motor Carrier Act of 1980. These rules and policies, in effect when the various applications challenged by Port Norris were made, were in large part invalidated by *ATA* I because they required applicants to request and receive wider authority than could be justified under the statute.[1] Although in the present case the ICC has chosen to defend

---

* Honorable Hubert I. Teitelbaum, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. In *American Trucking Associations, Inc. v. ICC*, 669 F.2d 957 (5th Cir. 1982) (*ATA* II), the Fifth Circuit issued a writ of mandamus enforcing *ATA* I, along with an opinion clarifying its initial decision. In *American Trucking Associations, Inc. v. ICC*, 673 F.2d 82 (5th Cir. 1982) (*ATA* III), the court declined to undertake an across the board review of all ICC decisions in violation of *ATA* I. According to *ATA* II, *supra*, 669 F.2d at 959, n.1, the ICC allowed the time for filing a petition for certiorari with the Supreme Court in *ATA* I to lapse. After *ATA* II, however, the ICC petitioned for certiorari, asking the Supreme Court to review both *ATA* I and *ATA* II. Justice White issued a stay of the mandamus pending the filing and the disposition of the ICC's petition for certiorari, S.Ct. No. A–810 (March 29, 1982). In the present case, the ICC and Port Norris have not discussed *ATA* II or *ATA* III. Port Norris relies heavily on *ATA* I, and the ICC distinguishes but does not challenge *ATA* I. A recent decision of the District of Columbia Circuit, *Ritter Transportation, Inc. v. ICC*, 684 F.2d 86 (D.C.Cir.

its grant of authority, we conclude that this grant—like those involved in the previous *Port Norris* cases—requires reconsideration in light of *ATA* I.[2]

## I

On February 7, 1981, Dennis Trucking Company, Inc. (Dennis) filed an application with the ICC pursuant to 49 U.S.C. § 10922(b).[3] The application sought to expand the authorization that the company previously held, so that it would be able to transport "general commodities" (except for Class A and B explosives) in a region fully encompassing twelve states and the District of Columbia. Authority to transport "general commodities" includes among

1982), relying on *ATA* I and on *Steere Tank Lines, Inc. v. ICC,* 666 F.2d 255 (5th Cir. 1982), vacated an order of the ICC that had removed restrictions on Port Norris. Port Norris' authority is not an issue in the present case, however.

2. A fifth Port Norris case, No. 81–3019, Allied Bulk Carriers, Inc., Intervenor, has yet to be decided by this Court.

3. That provision reads:

(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need; unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with public convenience and necessity.

(2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:

(A) the transportation policy of section 10101(a) of this title; and

(B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

(3) The Commission may not make a finding relating to public convenience and necessity under paragraph (1) of this subsection which is based upon general findings developed in rulemaking proceedings.

Section 10101(a), referred to in § 10922(b)(2)(A), reads:

§ 10101. *Transportation policy*

(a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title [49 USCS § 10101a] shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters;

(6) to encourage fair wages and working conditions in the transportation industry; and

(7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.

other things the right to transport both "bulk" and "household goods" unless these two highly specialized types of service are specifically excepted from the grant. Commodities carried in bulk are poured or placed in the vehicle without regard to order and without packaging. *See Steere Tank Lines, Inc. v. ICC*, 666 F.2d 255, 257 n.3 (5th Cir. 1982). Dennis had not previously carried either household goods or bulk commodities, and its territorial range had been much narrower than that sought in the application. Dennis' application was supported by statements of thirty-five shippers. While some of these shippers do ship commodities susceptible of being transported in bulk (*see* Addendum to Respondents' Brief at 27–29), none specifically stated that it needed Dennis to transport any commodities in bulk.

Port Norris, a carrier specializing in bulk transportation, filed a timely protest to Dennis' application, urging that there was insufficient evidence of public need to justify including bulk commodities in Dennis' authorization. A protest by a group of household goods carriers challenged the sufficiency of the evidence to support a finding either that Dennis was fit, willing, and able to transport household goods, or that Dennis had shown public need for its services as a household goods carrier.

On June 26, 1981, ICC Review Board No. 2 granted the entire authority for which Dennis had applied. Port Norris and the group of household goods carriers filed an administrative appeal. ICC Appellate Division No. 1, consisting of three Commissioners (one of whom did not participate in this case), affirmed the Review Board on September 10, 1981, without issuing an opinion. The ICC issued a certificate to Dennis on October 21, 1981.

Port Norris petitioned this Court on November 16, 1981 to review and set aside the decision of the ICC with respect to Dennis' bulk authority. Although there is some ambiguity in Port Norris' briefs, counsel made clear at oral argument that Port Norris does not challenge Dennis' authorization to transport household goods. In as much

as the household goods carriers did not seek review of the Appellate Division's decision, we do not consider the propriety of the grant of household goods authority to Dennis. Dennis has filed a brief as an intervenor in support of the ICC. Respondent United States of America has declined to oppose or support the ICC's decision in the present case.

## II

It is undisputed that the Motor Carrier Act of 1980, Pub.L.No.96–296, 94 Stat. 793 (1980), which is the source of 49 U.S.C. § 10922(b), was designed to ease carrier entry into the trucking industry. *See Gamble v. ICC*, 636 F.2d 1101, 1103 (5th Cir. 1981): "The principal goals of the legislation ... are to promote greater competition by allowing easier carrier entry, to simplify and expedite the certification process, and to lessen restrictions on motor carrier operations." Indeed, the Act itself states that it is "part of the continuing effort by Congress to reduce unnecessary regulation by the Federal Government," and that "historically the existing regulatory structure has tended in certain circumstances to inhibit market entry, carrier growth, maximum utilization of equipment and energy resources, and opportunities for minorities and others to enter the trucking industry." Motor Carrier Act of 1980, §§ 2 & 3, 94 Stat. at 793 (1980).

The Act, however, plainly did not deregulate motor carrier entry completely. If the ICC is to grant authority to a party such as Dennis, then under section 10922(b)(1)(A) it must find that Dennis is "fit, willing, and able" to perform the authorized service; further, under section 10922(b)(1)(B), it must find that there is a "public demand or need" for the service. The legislative history of these provisions helps to clarify the balance Congress was attempting to strike between easing entry on the one hand and retaining regulation on the other:

Paragraph (1) of the new section 10922(b) sets forth the entry standards to be used by the Commission in determining whether to issue a certificate autho-

rizing operation as a motor common carrier of property. It retains the traditional test that all applicants must be fit, willing, and able. However, it revises the public convenience and necessity requirement. Specifically, it reduces the burden of proof on persons supporting the application. Persons supporting the application will be required to come forward with some evidence of a public need or demand for the service. Under this standard, proponents of the application must show that the service they propose would serve a useful public purpose, responsive to a public demand or need. For example, this demonstration could be made by public officials, shippers, receivers, trade associations, civic associations, consumers, and employee groups, as well as by the applicant itself. The normal way to establish this has been for applicants to submit evidence of some of those who would use the service proposed. The Committee thinks that this is still the most effective evidence, for it provides the Commission with the information it needs to frame a grant of authority and provides a factual framework for dealing with the application and the interests of the parties on both sides. However, the Committee does not intend to restrict the Commission in which factors it can consider in determining whether the proposed service is responsive to a public demand or need. These factors include the following: a need or demand for new services, innovative quality or price options, increased competition, greater fuel efficiency, improved service for small communities, improved opportunities for minorities, and any other benefits that would serve a useful public purpose. This is consistent with the Commission's consideration of the National Transportation Policy, including any of the applicable factors listed in section 10101(a)(7)(A) through (H). Where an application is uncontested, the Commission will be concerned with the fitness of an applicant and whether the applicant has met his *prima facie* showing of public need.

H.R.Rep.No.96–1069, 96th Cong., 2d Sess. 14–15 *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2296–97.

Port Norris argues that despite the statement in the House Report that "[p]ersons supporting the application will be required to come forward with *some evidence* of a public need or demand for the service," the Act requires that *"substantial evidence"* be proffered. Reply Brief at 16–18. Because we find that there is not even "some evidence," we see no need here to resolve the issue.[4] With respect to the "fit, willing, and able" criterion, the ICC seems not to dispute that there must be "substantial evidence" of Dennis' qualifications to provide transportation in bulk. And it appears to concede that the standard of review this Court must utilize is that the agency's decision must be set aside if "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). Respondent's Brief at 13.

> Substantial evidence has been defined as: . . . "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126]. Accordingly, it "must do more than create a suspicion of the existence of the fact to be established. . . . it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660].

---

4. The ICC's position on this question is puzzling. Though its brief here argues that "some evidence" of public demand or need is all that is required, it has clearly announced in *Averitt Express, Inc., Extension—Points in the United States*, No. MC–121600, Sub. No. 13F (unprinted; Division 1), serv. February 6, 1981, that it does *not* employ the "some evidence" standard in this context. *See also*, e.g., *Rockingham Carriage Service, Inc., Extension—Trucks, Truck Chassis, Trailers and Busses*, No. MC–153553, Sub. No. 1 (unprinted; Division 1), serv. January 8, 1982, which appears to indicate that the ICC requires "substantial evidence" of public demand or need.

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). *See also*, e.g., *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Under ICC "guidelines" in effect when Dennis made its application (the so-called "New Certificate Statement," Ex Parte No. 55 (Sub-No. 43A), 45 Fed.Reg. 86,798 (1980)), Dennis had little choice but to apply for bulk authority whether or not it was "fit, willing, and able" to transport in bulk and whether or not there was a "public demand or need" for its services as a bulk carrier. And under these same guidelines the ICC is likely to have granted such authority regardless of whether the two statutory requirements had been met. *ATA* I, *supra*, found that these "guidelines" insofar as they pertain here, contravened the statute. According to *ATA* I, the so-called guidelines were in fact mandatory rules enforced by threats of delay and of expensive litigation.[5] The Court concluded:

> In short, in its announcement in the New Certificates Statement, the Commission has prescribed the use of its list of certain commodity descriptions, "discouraged" the use of any deviations from the list, and required justification for proposing a deviation from the prescribed list.[99] The Commission states that carriers may seek to justify departure from its standards. This imposes the same in terrorem constraint that the Commission found to have been the past practice but now condemns: the fear of lengthy and expensive litigation.

---

[99] In numerous instances the Commission has granted applicants authority they did not seek. In [many] cases the applicants applied for authority to transport general commodities (*except* household goods and classes A and B explosives) but were granted by the Commission authority to haul *all* general commodities except classes A and B explosives. . . .

The New Certificate Statement has been applied in mechanistic fashion to other applicants. Thus, in *Red Arrow Freight Lines, Inc.*

**5.** See also *Steere Tank Lines, Inc. v. ICC, supra*, 666 F.2d at 257, which relies on *ATA* I for its view that the ICC's "restriction removal" guidelines "ineluctably compel an applicant to use the categories suggested by the Commis-

*v. ICC, appeal docketed*, No. 81–4109, (5th Cir. Apr. 2, 1981), the applicant testified, in response to an opposing carrier's argument that it "is not in a position to handle and does not intend to handle [bulk commodities] now or in the foreseeable future," that it had no tank vehicles or no intention to purchase any, and that the only reason it applied for general commodities unrestricted to bulk was because it believed it had to use that description under the Commission's "policy statement" Nevertheless, the Commission refused to restrict the grant of authority against transportation of bulk commodities.

In *Steere Tank Lines, Inc. v. ICC, appeal docketed*, No. 81–4170, (5th Cir. May 11, 1981), the petitioner opposed the application because it included bulk commodities pursuant to the "policy statement," pointing out applicant had never provided bulk service, had no shippers seeking that service now, and had no equipment or intention to render such service. The applicant conceded all these matters and took no position on whether a restriction should be placed on the certificate. The Commission stated that it "no longer favors imposing bulk restrictions" as they are "too restrictive."

659 F.2d at 471–472, footnotes other than 99 omitted. Addressing himself specifically to the issue of bulk service, Judge Alvin Rubin wrote for the court:

> The New Certificates Statement states that the Commission's policy is to "disallow all restrictions except those implicitly or explicitly acceptable in the Act," including elimination of bulk services restrictions from grants of general commodities authority. The Commission recognized that "[w]hile it is true that every carrier does not operate every type of equipment all of the time," it still maintained that "nothing is gained by limiting authorities merely because the applicant does not already have the special equipment." Apparently, the Commission was motivated by a desire to achieve "overall transportation economies and efficiencies . . . by encouraging competition."

> Here, . . . the Commission has exceeded its statutory mandate by granting authority to carriers who cannot demon-

sion" and have a "coercive effect." *ATA* I made findings both with respect to "restriction removal" and "new certificates," but only a "new certificate" is involved in the present case.

strate that they are "fit, willing, and able to provide the transportation to be authorized by the certificate." Bulk service requires special equipment, such as tank trucks, that many carriers do not have. Moreover, as pointed out by opponents to the Commission's statement, most carriers are not fit to provide bulk service because they will not have the proper cleaning facilities for tank trucks, and in the case of hazardous bulk materials (other than class A and B explosives), will not know the appropriate safety regulations for handling bulk items, or have satisfied the special insurance limits pertaining to hazardous materials.

*Id.* at 472–473, footnotes omitted.

### III

In this appeal, the ICC does not question *ATA* I; rather the ICC attempts—unsuccessfully we believe—to distinguish it:

> Respondents submit that the *ATA* requirements have been met here. Petitioner's arguments to the contrary presume that, to receive bulk authority, an applicant must already be outfitted for bulk operations (even if it does not currently perform such service) and must present shippers who stand ready immediately to tender shipments in bulk.

Respondent's Brief at 15.[6] In an omitted footnote the ICC "emphasize[s] that [it is] not here advocating bulk authority absent a showing of need for or fitness to conduct such service." But it would appear that the ICC has failed to appreciate the true basis of the case against it. The point is not that Dennis must be fully outfitted at the time it applies or that shippers must be immediately ready to tender shipments in bulk to Dennis. The important points in this case appear to be these:

(A) Whether or not there was sufficient evidence under Section 10922(b), the Administrative Procedure Act (APA) imposes a duty on the ICC to articulate the factual bases for its decision; the ICC may not simply rely on the policy, struck down in *ATA* I, of routinely granting bulk authority without regard to the facts of the proceeding.

(B) Quite apart from Dennis' lack of equipment, the evidence does not support a finding that Dennis was willing to provide bulk service.

(C) Since any finding that Dennis is fit to transport in bulk depends on a finding that it is willing to acquire the necessary equipment, unwillingness to acquire necessary equipment here implies unfitness.

(D) When the only evidence of public demand or need for bulk service is the statements of supporting shippers, the shippers must at least make clear that they consider that they have a need for bulk service from Dennis.

We discuss each of these points in turn.

### A

In *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), there seemed "to be agreement that the findings and conclusions of the Commission [were] supported by substantial evidence." But this did not resolve the question whether the ICC's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), since the "arbitrary and capricious" standard of section 706(2)(A) is distinct from the "substantial evidence" standard of Section 706(2)(E). Both standards are of course part of the APA. *Bowman Transportation* summarized the law as follows:

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although, this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered

**6.** The ICC refers to itself in the plural, apparently overlooking that the United States of America declined to take any position in this case.

to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, [401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970)]. The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 245, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*Id.* 419 U.S. at 285–286, 95 S.Ct. at 441–42. The "reasoned basis for the agency's action" must be provided by the agency in the administrative proceedings. We "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). As *Argo-Collier Truck Lines Corp. v. United States*, 611 F.2d 149, 152 (6th Cir. 1979), explains:

> It is essential to the decisionmaking process that the ICC articulate clearly its findings on the factual issues which form the basis for its decisions. Without such findings, a reviewing court is unable to perform its function of ascertaining that the ultimate conclusions are derived from the record before the agency and not the result of discretion exercised in an arbitrary and capricious manner. *Trans-American Van Service, Inc. v. United States*, 421 F.Supp. 308, 319 (N.D.Tex. 1976).

Since the Appellate Division, in dismissing appeals from the Review Board's decision, did not issue an opinion, we consider only the opinion of the Review Board. The ICC's brief does not so much defend the Review Board opinion as blame Port Norris for the Review Board's inadequacies. The brief appears to make no claim that the Review Board ever addressed the specific issue of Dennis' fitness or willingness to transport in bulk, or of the public demand or need for Dennis' services as a bulk carrier.

Instead the ICC points out that Port Norris' initial protest was almost exclusively focused on the alleged competitive harm that Port Norris would suffer if Dennis' application were granted.[7] But the ICC fails to explain why Port Norris' decision to base its protest primarily on the issue of competitive harm should excuse the ICC from making findings as to Dennis' fitness and as to public demand or need for the services proposed by Dennis. Legislative history would suggest that even "[w]here an application is uncontested, the Commission will be concerned with the fitness of the applicant and whether the applicant has met his *prima facie* showing of public need," H.R.Rep.No.96–1069, *supra*, at 15, U.S.Code Cong. & Admin.News at p. 2297. Section 10922(b)(3) further confirms the ICC's obligation to make an individual determination of public convenience and necessity even in uncontested cases. Moreover, Port Norris' protest did state that it thought there was insufficient evidence of public need for additional bulk service (e.g., Appendix at 204, 208) and even reminded the ICC of its duty to make factual findings of public convenience and necessity and not to rely solely on general policies (Appendix at 207). In its administrative appeal, Port Norris challenged Dennis' willingness if not its fitness (Appendix at 319), although the Appellate Division did not respond. But the important point is that, regardless of the issues to which Port Norris called attention, the Review Board was bound to "artic-

---

**7.** The issue of competitive harm has been dropped by Port Norris. Port Norris apparently no longer believes that it could meet its burden under Section 10922(b)(1) of demonstrating that a grant, supported by sufficient evidence of public demand or need, would nevertheless cause such harm as to be "inconsistent with public convenience and necessity." But, of course, it claims that Dennis has not met its initial burden of showing public demand or need.

ulate a 'rational connection between the facts found and the choice made,'" *Bowman Transportation, supra,* 419 U.S. at 285, 95 S.Ct. at 441.

The Review Board completely neglected to make any findings with respect to bulk service. It failed even to mention that it *was* granting bulk authority, although of course the "general" authorization it granted did include bulk. This treatment of bulk authority is certainly understandable in view of the then-existing ICC policy, but it strongly suggests that the Review Board was basing its decision solely on ICC policy and not on the facts of the case. Port Norris can hardly be blamed for the Review Board's failure to mention specifically transportation in bulk, inasmuch as Port Norris' protest. repeatedly mentioned its concern over the possible inclusion of bulk authority within the grant to Dennis.

Even if there were no problems with the sufficiency of the evidence, we would be required to remand on the ground that the ICC's action, because its basis was unexplained, was arbitrary and capricious. Insofar as we can discern a basis for the decision, that basis seems to be the improper ICC policy of granting bulk authority without regard to whether the statutory requirements have been met.

B

Perhaps the ICC's failure at the administrative level to articulate the basis for finding that Dennis was *willing* to transport in bulk would not in and of itself be arbitrary and capricious. This is so because a reviewing court might in some circumstances be entitled to assume that the ICC was simply relying on the fact that the applicant requested bulk authority as evidence of the appellant's willingness. But whether or not the ICC's failure to *discuss* any evidence of willingness was arbitrary and capricious, the record in this case cannot support a finding that Dennis was willing to carry commodities in bulk.

Dennis' own "Rebuttal Argument" to the administrative protest of Port Norris and the household goods carriers is quite damaging to the ICC's cause:

We recognize that none of the shippers supporting the application expressly mention a need for the transportation of commodities in bulk or for the provision of household goods transportation service. While Dennis has no present intent to become involved in the provision of household goods transportation services or in the transportation of commodities in bulk, the scheme of regulation now adhered to by the Commission, pursuant to the 1980 Act, suggests that Dennis not be foreclosed, by operating authority restrictions from engaging in either type of service.

Although Dennis will not seek reconsideration of a grant restricted against the transportation of commodities in bulk and household goods, if the Commission finds that the application should be so restricted, Dennis, while recognizing the dearth of support specifically seeking such service, requests the issuance of a Certificate unencumbered by either such restriction.

Appendix at 305–306. Dennis repeated this passage word for word in replying to the administrative appeal of the household goods carriers (Appendix at 327) and again in replying to the administrative appeal of Port Norris (Appendix at 334).

Attempts by the ICC to explain away this passage are unsuccessful. The ICC reads Dennis' lack of "present intent" to transport in bulk as an expectation that bulk shipments would not "be tendered to it immediately." Respondent's Brief at 19 and 21 n.21. But there is a substantial difference between lacking a present intent to transport in bulk and having an expectation that no bulk shipments would be tendered immediately. One can expect that others will immediately request a service from one, and yet have no intent to provide it. Dennis' language cannot support an inference that Dennis *ever* intends to provide bulk service.

The ICC and Dennis in their briefs stress that Dennis asked not to be foreclosed from carrying in bulk. But what the passage

quoted above actually says is not that Dennis wants not to be foreclosed but that the ICC's *scheme of regulation* suggested that Dennis not be foreclosed. Dennis' language indicates that what may well have occurred here is precisely what *ATA* I condemns: an applicant requesting and receiving authority not because it desires the authority but because it feels compelled to do so by ICC policy.

In addition, the ICC argues that Dennis' statement that it would not appeal a grant of restricted authority is explicable as reflecting a desire on Dennis' part to avoid the delay and expense of protracted litigation. But while failure *actually to take* an appeal might reflect such a desire, it is difficult to see how *stating in advance of decision* that it would accept an adverse judgment could have saved Dennis any time or money. Dennis' statement that it would not appeal therefore may appropriately be construed as indicating a lack of interest in obtaining the full authority requested.

Similarly, if Dennis indeed desired bulk authority, it is anomalous that it would call attention to the weakness of its own case. Yet twice in the quoted passage Dennis refers to the paucity of specific shipper support for bulk authority and makes no attempt to balance this admission with a statement to the effect that shipper support is nonetheless sufficient.

In another paragraph of its "Rebuttal Argument," Dennis expresses its view that the "principal thrust" of its application is not the request for household goods and bulk transportation authority, but the request to expand territorially. Again, Dennis sought to stress that it had little interest in bulk authority, and again this tends to undermine any inference of willingness.

Dennis' original application also undercuts the ICC's supposed finding of willingness. Dennis did seek "general authority," and did not specifically ask the ICC to except bulk authority from this. But the ICC and Dennis point to no language at all in the application expressing an interest in bulk authority.

The ICC can do no more than cite several expressions of Dennis' willingness (and ability) to provide the "proposed services," expressions which fail specifically to mention bulk authority. Respondent's Brief at 22–23, citing Appendix at 10, 11, 15, 41, 42. And the section of Dennis' application that deals with proposed service (Appendix at 14–15) states that Dennis "proposes to offer the same type of services presently provided, in an expanded, but concentrated, service area"—in other words, that Dennis seeks to continue to provide non-bulk service, but in a larger area.

Dennis' brief in the present appeal does specifically express a willingness to transport in bulk. But of course this brief was not part of the administrative proceedings. And even in its appellate brief, Dennis' expressions of willingness are rather tepid. Dennis notes that the authority requested was in accordance with ICC policy at the time of the application, and that *ATA* I was not decided until after the ICC Appellate Division had reached a final decision in the present case. Dennis legitimately complains that it "found itself caught up in this unsettled period." Intervenor's Brief at 8. The implication of this argument is that Dennis might very well *not* have applied for bulk authority had it known of *ATA* I before it submitted its application. Dennis acknowledges that ICC policy was one of the factors inducing it to apply for general authority with no exception for bulk. But the only other factor it cites is the allegedly broad nature of the supporting shippers' traffic, not its own fitness or willingness. Intervenor's Brief at 8.

Whatever slight evidence of willingness there may be in this proceeding is based solely on the fact that Dennis did apply for general authority and did not specifically ask the ICC to except bulk transportation from the general grant. Even if such evidence would under other circumstances suffice to show willingness, in this case it is fatally tainted by the ICC policies that left Dennis little alternative but to apply for bulk authority.

## C

It is undisputed that at the time of its application Dennis lacked bulk capability. Any finding of fitness therefore would depend on a finding that Dennis is willing to acquire the necessary equipment. If there is insufficient evidence of willingness to transport in bulk, then under the facts of this case there is also insufficient evidence of fitness. To guide the ICC on remand, we note our agreement with its view that an applicant need not be fully outfitted to carry in bulk at the time of application in order for the applicant to be considered fit. On the other hand,

> Whether an applicant has the proper equipment to provide [the proposed] service is an important consideration in determining whether the requirements have been met. *American Trucking* [*ATA* I] at 465, 473.[2]

---

[2] It may be enough that the applicant is willing and has the financial resources to obtain the equipment since it would not be prudent business practice for a carrier to open new terminals and buy additional equipment before it knows whether the authority it seeks will be granted.

*Steere Tank Lines, Inc. v. ICC*, 675 F.2d 103, 104 (5th Cir. 1982).

## D

ICC's argument that there was sufficient evidence of public demand or need, despite the failure of all thirty-five supporting shippers specifically to mention a need for bulk service, is not persuasive. The contention is in essence that three or four of the supporting shippers ship (among other things) commodities that are "susceptible of being transported in bulk." This includes one shipper (U. S. Gypsum) that ships one commodity, among many, that is allegedly

---

8. Even Crest Brick Co. did not say that it needed bulk service from Dennis. Crest Brick Co. ships many commodities besides bauxite and aluminum, and it ships bauxite and aluminum in bags, boxes, and drums as well as "loose," i.e., in bulk. Thus it is quite difficult to support an inference of need for bulk service, even from Crest Brick Co.'s statement.

9. The ICC also intimates that an additional shipper, Bethlehem Steel, stated that it would

"almost invariably transported in bulk," and another shipper (Crest Brick Co.) that supposedly ships "bauxite and aluminum . . . loose in bulk." *See* Respondent's Brief at 18, 19, 27–29.[8] Because a few of the supporting shippers stated that they ship some commodities that are at least susceptible of being transported in bulk it can be inferred that they need Dennis to ship these commodities in bulk, or so the ICC now maintains.[9] Since Dennis undoubtedly expected that it would be given bulk authority in any case, provided that its request for territorial expansion was approved—and since Dennis may not even have wanted bulk authority—it is not surprising that Dennis' supporting shippers should have had so little to say about bulk needs.

The evidence of public demand or need in this proceeding is so indirect and speculative as to fail even the minimal standard of section 10922(b)(1)(B). Of course, the ICC is entitled to make certain inferences from the evidence. But when the sole "evidence presented by persons supporting the issuance of the certificate" pursuant to section 10922(b)(1)(B) is the statements of shippers who plan to use the service proposed, it cannot be too much to expect one or more of these shippers—we express no view as to how many are needed—to make it clear that they believe they have some need or are prepared to make a demand for the service.

## IV

Accordingly, the grant of authority to Dennis insofar as the grant encompasses authority to transport in bulk will be vacated, and the matter will be remanded to the ICC for further proceedings consistent with this opinion.

---

require bulk service in the future. Respondent's Brief at 19 n.19. This is somewhat misleading. So far as the record indicates, Bethlehem Steel appears to ship *no* commodities susceptible of being transported in bulk (see Addendum to Respondent's Brief at 27–29), and its concern with future needs seems clearly to be a concern with increased future demand for the same commodities it currently ships. *See* Appendix at 48.