PORT NORRIS EXPRESS CO.,
INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Allied Bulk Carriers, Inc., Intervenor in
Support of Respondents.

No. 81–3019.

United States Court of Appeals,
Third Circuit.

Argued July 23, 1982.

Decided Dec. 29, 1982.

**498**

William P. Jackson, Jr. (argued), David L. Lause, Jackson & Jessup, P.C., Arlington, Va., for petitioners; Jackson & Jessup, P.C., Arlington, Va., of counsel.

John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Edward J. O'Meara (argued), I.C.C., Washington, D.C., William F. Baxter, Asst. Atty. Gen., Robert B. Nicholson, Neil R. Ellis, Dept. of Justice, Washington, D.C., for respondents.

Before ADAMS and HIGGINBOTHAM, Circuit Judges and TEITELBAUM,* District Judge.

---

* Honorable Hubert I. Teitelbaum, United States District Court for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

In this case we are asked to review and set aside the order of the Interstate Commerce Commission (ICC) granting Allied Bulk Carriers, Inc. (Allied) a certificate to operate as a common carrier, by motor vehicle, in interstate or foreign commerce, transporting commodities in bulk between points in New York, New Jersey, Connecticut, Pennsylvania, Delaware, and Maryland. Petitioner, Port Norris Express Co., Inc. (Port Norris) asserts that the evidence of record does not support the ICC's findings that Allied is fit, willing and able to provide the proposed service, and that there is a public demand or need for the proposed service. We do not find error in the ICC's decision, and therefore, will deny the Petition for Review.

### I.

### FACTS

In February, 1981, Allied, an intrastate carrier of bulk commodities, applied for a Certificate of Public Convenience and Necessity authorizing it to engage in transportation as a common carrier, by motor vehicle, over irregular routes, transporting commodities in bulk between points in New York, New Jersey, Connecticut, Pennsylvania, Delaware, and Maryland. Four shippers of bulk commodities submitted statements in support of Allied's application: Stauffer Chemical Company (Stauffer); AMETEK, Westchester Plastics Division (Ametek); Union Chemicals Division, Union Oil Company of California (Union); and Exxon Chemical Americas (Exxon).

Port Norris, a motor carrier specializing in bulk transportation, was the only protestant to Allied's application. In timely filed objections, Port Norris argued that granting Allied's application would be contrary to the public interest because it would allow

traffic in bulk commodities to be diverted from Port Norris, and would create a "destructive competition" threatening to Port Norris' continued existence. Port Norris also contended that the evidence failed to establish a public need for Allied's expanded authority or Allied's fitness, willingness and ability to provide the service.

In its decision of June 8, 1981, served June 26, 1981, Review Board No. 2 awarded Allied a partial grant of authority permitting Allied to transport commodities in bulk between the facilities of the four supporting shippers located in the six-state area of New York, New Jersey, Connecticut, Pennsylvania, Delaware, and Maryland on the one hand and, on the other hand, other points within the six-state area. Review Board No. 2 denied Allied's request for non-radial authority, which would have permitted Allied to operate between any two points in the six-state area without reference to a base point, because the public need for it could not be adduced from the evidence offered by Allied. Specifically, Review Board No. 2 limited Allied to shipments in which one of the supporting shipper's facilities was the origination or destination point because it found that Allied and the supporting shippers had failed to sufficiently identify "actual, future, or representative origins or destinations between which traffic will or may be transported, [or] to describe, even in general terms, the geographic movement of the traffic." *Allied Bulk Carriers, Inc., Common Carrier Application*, No. MC–154152, App. at 59. Review Board No. 2 concluded, however, that a partial grant of authority would serve a useful public purpose responsive to public demand or need, that Allied was fit, willing and able to perform the granted authority in conformity with statutory and administrative requirements, and that Port Norris had failed to present evidence showing that the authority granted was inconsistent with public convenience or necessity or contrary to the public interest.

Allied filed an administrative appeal, contending that the shipper support submitted with its application provided sufficient evidence to justify a grant of unrestricted authority. ICC Appellate Division No. 2, consisting of three commissioners, agreed with Allied, reversed Review Board No. 2, and on September 4, 1981, granted Allied's application for unrestricted authority. The appellate division rejected Port Norris' assertion that facilities restriction was proper and found that Port Norris had failed to establish that an unrestricted grant would adversely affect Port Norris' operations to an extent contrary to the public interest. Port Norris' subsequent Petition for Administrative Review was denied summarily by the entire ICC on October 16, 1981. On January 6, 1982, the ICC issued a Certificate of Public Convenience and Necessity to Allied.

Port Norris urges this court to set aside the decision of the ICC for three reasons. First, it asserts that the record lacks substantial evidence to support the ICC's finding that Allied was fit, willing and able to provide the transportation service granted. Second, it argues that Allied failed to establish a *prima facie* case of public demand or need for the transportation service granted and that the ICC's finding otherwise was in error. Finally, Port Norris asserts that because the ICC failed to articulate any rational basis for its findings and conclusions, its decision was arbitrary, capricious, and not in accordance with law.

## II.

### A. The Applicant's Burden of Proof

Pursuant to the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980), a Certificate of Public Convenience and Necessity may only be issued if the ICC finds that the applicant is "fit, willing, and able to provide the transportation authorized" and that "the service proposed will serve a useful public purpose, responsive to a public demand or need." 49 U.S.C. § 10922(b)(1)(A) and (B).[1] The applicant

---

1. Section 10922(b)(1)(A) and (B) provides:
   (1) Except as provided in this section, the Interstate Commerce Commission shall issue a

certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II

for motor carrier operating authority has the burden of proving its fitness and ability. *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452, 469 (5th Cir.1981); *Kroblin Refrigerated Express, Inc. v. United States*, 197 F.Supp. 39, 47 (N.D.Iowa 1961). This generally requires the applicant to show that it is financially fit, willing to comply with the rules and regulations of the ICC, and able to perform the service in a safe manner. *Rules Governing Applications for Operating Authority*, 364 I.C.C. 508, 539–41 (1980), appeal pending *sub nom. American Transfer and Storage Co. v. ICC*, No. 80–4072 (5th Cir., filed Feb. 23, 1981); *see also, Consolidated Carriers, Inc., Common Carrier Applications*, 131 M.C.C. 104, 108; *Latin Express Service, Inc., Common Carrier Application*, 132 M.C.C. 289, 297 (1980).

■ The statute also places on the applicant the burden to provide the ICC with sufficient evidence to establish a *prima facie* case of public demand or need for the proposed service and to show that the service serves a useful public purpose. The evidence may consist of user support statements or other indicia of public need. *Pre-Fab Transit Co. Ext.—Nationwide General Commodities*, 132 M.C.C. 409, 411 (1981).

But "an applicant's evidence, whatever it consists of . . . , must establish with reasonable particularity a rational connection between the specific public needs shown and the breadth of the authority requested, . . ." *Tri-State Motor Transit Co., Ext., General Commodities*, 132 M.C.C. 504, 513 (1981). *See also, Green Field Transport Co., Inc., Ext.—General Commodities*, 132 M.C.C. 584, 589 (1981). Evidence of objecting parties must be considered by the ICC, which may deny a certificate which it finds inconsistent with public convenience or necessity. 49 U.S.C. § 10922(b)(1)(B).

In *Pre-Fab Transit Co.*, the ICC enunciated evidentiary guidelines for determining whether or not an applicant has met its threshold burden of showing that a proposed service would serve a useful public purpose, responsive to public demand or need. Declaring that it would no longer look to the criteria set forth in *Novak Contract Carrier Application*, 103 M.C.C. 555 (1967),[2] the ICC stated:

> If applicants rely on shipper support, the evidence should tell us something about the present or future direction, quantity, and type of traffic involved. This evidence need not be precise. In the

of chapter 105 of this title as a motor common carrier of property if the Commission finds—
> (A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and
> (B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with public convenience and necessity. Also relevant is § 10922(b)(2) which provides:
> (2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:
> (A) the transportation policy of section 10101(a) of this title; and
> (B) the effect of issuance of the certificate on existing carriers, except that the Commis-

sion shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

2. In *Pre-Fab Transit Co.*, 132 M.C.C. at 414, the ICC commented that:
> The *Novak* guidelines required a minimum showing of the commodities shipped or received, points to or from which traffic moved, volumes of freight to be tendered to applicant, transportation now used for moving the involved traffic, and difficiencies in existing service. These were useful, but they could not be strictly applied. Courts reminded us that the proper purpose of these guidelines was to provide the Commission with sufficient information to determine the basic nature and extent of the public's transportation needs, and not to serve as procedural hurdles. See *Twin City v. United States*, 360 F.Supp. 709, 712–13 (D.Minn.1972), and *Claycon Transports Corporation Ext.—Clay*, 126 M.C.C. 420, 423 (1977).

past we have accepted shipper contentions that development of new product lines or new marketing strategies preclude specification of commodities, volumes, or points involved. Given the policies of granting broad applications and of removing excessively narrow restrictions, the latitude for acceptable imprecision is even wider. *However, shipper supported applications should provide sufficient information for us to determine the basic nature of the public's transportation needs or demands of which their supporting shipper's statements are representative.*

Applications relying on other types of support should also present reliable and probative evidence showing that a proposed operation will serve a useful public purpose, responsive to a public demand or need. However, we cannot specify what informational elements must be supplied for this purpose, as our experience under the new law is quite limited as yet. Plainly, carriers can put forth innovative rate proposals, means by which the new authority would help rationalize their operations and make them more efficient, the amount of fuel likely to be saved, small communities and rural areas to be served, or marketing surveys showing prospective customers who might use the service if authorized. We do believe that any optional types of evidence submitted ordinarily should be directed to elements of the national transportation policy enunciated at 49 U.S.C. § 10101(a)(7). While these policies are primarily deci-

sional standards which the Commission will consider to the extent applicable in a given proceeding, they are useful also as guides to the type of evidence applicants may submit. *Reliable evidence showing that a proposed operation would promote competitive and efficient transportation service designed to meet one or more of the enunciated policies would establish a threshold useful public purpose case in most instances.* We reiterate that some hard information or genuine proposal is required. Mere assertions alone are insufficient.

We recognize that the above guidelines are less explicit than *Novak* type criteria. *We believe that this lack of specificity is appropriate at a time when we are trying to implement a new direction in motor carrier entry policy. A case-by-case development will be helpful.*

*Pre-Fab Transit Co.,* 132 M.C.C. at 413–14 (emphasis added) (footnotes omitted).

In accordance with the liberalized entry policy mandated by Congress in the Motor Carrier Act,[3] the burden of proof on appellants has been lessened. H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 14–15, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2296–97. *See also, Port Norris Express Co., Inc. v. ICC,* 687 F.2d 803, 806 (3d Cir.1982) (*Port Norris v. ICC (I)* ). Although the ICC may not grant applications for operating authority automatically, congressional emphasis on the importance of competition in the national trucking industry indicates that it will be substantially easier for appli-

---

3. This policy is set forth at 49 U.S.C. § 10101(a)(7) which provides as follows:

§ 10101. Transportation Policy

(a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

\* \* \* \* \* \*

(7) with respect to transportation of property by motor carrier, to promote competitive and

efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.

cants to obtain new authority. *Port Norris v. ICC (I)* at 806–807; *Gamble v. ICC,* 636 F.2d 1101, 1103 (5th Cir.1981); *Tri-State Motor Transit Co., Ext.—General Commodities,* 132 M.C.C. at 513.

## B. The Standard of Review

█ As a court reviewing an agency decision, we must determine whether the agency's findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) and (E). *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* ... 401 U.S. [402,] 416, 91 S.Ct. [814,] 824 [28 L.Ed.2d 136]. The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945).

*Bowman Transportation, Inc.* at 285–86, 95 S.Ct. at 441–42.

The Supreme Court has defined "substantial evidence" in the context of court review of an administrative agency decision as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), *quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Substantial evidence is "more than a mere scintilla," *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), but is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo, supra,* 383 U.S. at 620, 86 S.Ct. at 1026.

█ The ICC and the United States of America, respondents in this case, assert that an applicant need only demonstrate "some evidence of a public need or demand for the service." Respondent's Brief at 17, citing H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. at 14, U.S.Code Cong. & Admin.News, p. 2296. In our view, however, an applicant must establish by "substantial evidence" that it meets the statutory criteria set forth in 49 U.S.C. § 10922(b)(1)(A) and (B). The Administrative Procedures Act, 5 U.S.C. § 551, *et seq.,* the statute which sets forth the applicable standard of review for judicial review of administrative agency decisions provides that: "Subsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly." 5 U.S.C. § 559. The Motor Carrier Act of 1980 did not expressly supercede or modify the rules set forth in the Administrative Procedures Act. Furthermore, the ICC itself has stated that "[t]he Commission has never applied a 'some evidence' rule" and that "[a]pplicants remain responsible for submitting sufficient evidence to carry their statutory *prima facie* case." *Averitt Express Inc., Extension—Points in the United States,* No. MC–121600, Sub. No. 13 F (unprinted; Division 1), serv. February 6, 1981. *See also, Rockingham Carriage Service, Inc., Ext.—Trucks, Truck Chassis, Trailers and Buses,*

No. MC–153553, Sub. No. 1 (unprinted; Division 1), serv. January 8, 1982, in which the ICC vacated a nationwide nonradial grant of authority because "from a territorial standpoint, the Review Board's grant is not supported by the requisite reliable, probative and substantial evidence." *Id.* at 1.

## III.

### THE EVIDENCE

A. Allied's Fitness, Willingness and Ability to Perform the Proposed Service

■ We find that there was substantial evidence in this case to support the ICC's conclusion that Allied was fit, willing and able to provide the proposed service. Allied, an established intrastate bulk carrier, submitted evidence of equipment availability; financial ability, including evidence that it is a profitably run carrier with capital available for expansion; operational facilities and personnel; safety compliance; services it rendered to the public at the time of filing; and services it proposed to render to the public if granted the additional authority. Verified Statement of Applicant, App. at 5–15.

Arguments raised by Port Norris in support of its assertion that the evidence of record on this issue is "almost nonexistent," Petitioner's Brief at 22–24, either are lacking in merit or do not sufficiently detract from the substantiality of Allied's evidence to warrant a different finding by us. Port Norris primarily relies on *American Trucking Associations, Inc. v. ICC,* 659 F.2d 452 (5th Cir.1981) (ATA), which sets forth factors for the ICC's consideration before authority to grant commodities in bulk may be granted.

> Bulk service requires special equipment, such as tank trucks, that many carriers do not have. Moreover, as pointed out by opponents to the Commission's statement, most carriers are not fit to provide bulk service because they will not have the proper cleaning facilities for tank trucks, and in the case of hazardous bulk materials (other than class A and B explosives), will not know the appropriate safety reg-

ulations for handling bulk items, or have satisfied the special insurance limits pertaining to hazardous materials.

*Id.* at 473 (footnotes omitted).

In contrast to ATA, however, this is not a case in which bulk authority is being thrust upon an applicant for general commodities authority. *See e.g., Port Norris Express v. ICC (I)* in which this court held that the ICC's grant of general commodities authority, including the right to transport bulk and household goods, to the applicant, Dennis Trucking Company, "requires reconsideration in light of ATA I [659 F.2d 452 (5th Cir.1981)]," because the record lacked substantial evidence to support the ICC's finding of the appellant's willingness to transport in bulk. Allied specifically requested only bulk authority. It presently provides intrastate transportation in bulk commodities and wishes merely to extend its operations to provide interstate services. From the evidence in the record it can be directly concluded or inferred that Allied, a bulk carrier, has, or is willing to acquire, the specialized knowledge and equipment for bulk transportation which the court in ATA said would show "at least *general* fitness, willingness, and ability to perform the services authorized by the certificate." ATA 659 F.2d at 470 (emphasis added).

B. The Finding of a Useful Public Purpose Responsive to Public Need and Demand.

■ After careful review of the record and the congressional policy underlying the Motor Carrier Act of 1980, we find, in light of the *Pre-Fab Transit Co.* criteria, that the ICC reasonably concluded that the evidence supported a grant of bulk authority within a limited six-state area. Four large supporting shippers identified a range of bulk commodities which Allied would be transporting for them under the operating authority sought. Stauffer specifically listed "numerous kinds of chemicals, fertilizers, food ingredients and plastic products" and provided an extensive representative list of commodities which it produced and distributed. App. at 16 and 20. Exxon listed

"liquid and dry chemical products such as alcohols, solvents, and plasticizers, as well as liquid petroleum gas and plastic pellets." App. at 29.

Each of the supporting shippers expressed a need for Allied's proposed service. Stauffer and Exxon indicated that they had used Allied in the past and that based on the satisfactory service which they had received, they would tender sufficient traffic to Allied to warrant the proposed service. Ametek stated that it would tender approximately 2,250,000 pounds of bulk goods per year to Allied, and Union, 500,000 pounds, if Allied's application were granted. Stauffer, Ametek and Union expressed dissatisfaction with existing transportation services they had employed. *See* Verified Statements of Shipper or Witness Support, App. at 16–32. The statements from the supporting shippers established "with reasonable particularity a rational connection between the specific public needs shown and the breadth of the authority requested," *Tri-State Motor Transit Co., Ext.* 132 M.C.C. at 513, and provided evidence from which the ICC could discern "the basic nature of the public's transportation needs or demands." *Pre-Fab Transit Co. Ext.,* 132 M.C.C. at 413.

Port Norris argues that Allied failed to demonstrate a public demand or need for its services because the supporting shippers failed to provide evidence of representative origin or destination points, facility locations, actual or potential customer locations, or shipping patterns. Petitioner's Brief at 25–26. Although the supporting shippers did not offer precisely the evidence Port Norris asserts is necessary to prove public demand or need, the evidence offered was in keeping with both the express intent of Congress to promote greater competition by allowing easier entry into the motor carrier industry, 49 U.S.C. § 10101(a)(7); *Gamble v. ICC,* 636 F.2d at 1103, and the policy and rules of the ICC.

In recent rulemaking proceedings, [Ex Parte No. MC–142 (Sub-No. 1), *Removal of Restrictions From Authorities of Motor Carriers of Property,* 132 M.C.C. 114 (1980); and Ex Parte No. 55 (Sub-No. 43A), *Acceptable Forms of Requests for Operating Authority,* 45 F.R. 86798 (December 31, 1980)] the Commission expressed its intention to effectuate less restricted grants of broader commodity and territorial authority based on relevant evidence. We believe it reasonable that applications for broad authority under the adopted rules in Ex Parte No. 55 (Sub-No. 43), *supra,* be accompanied by certain data.

If applicants rely on shipper support, the evidence should tell us something about the present or future direction, quantity, and type of traffic involved. *This evidence need not be precise.* *Pre-Fab Transit Co. Ext.,* 132 M.C.C. at 413 (emphasis added). *See also, Green Field Transport Co., Inc., Ext.,* 132 M.C.C. at 489. ("[W]e believe it is unwise at this stage to attempt to set out standards for mechanically deciding if a threshold case has been made, or to attempt to prescribe precisely what kinds of evidence an applicant should produce."); and *Tri-State Motor Transit Co., Ext.,* 132 M.C.C. at 513.

Each of the shippers stated that representative origins and destinations of traffic would be between points in New York, New Jersey, Connecticut, Pennsylvania, Delaware, and Maryland. Although specific locations or points were not included, the ICC could have reasonably inferred from that general information, Allied's description of its existing operations and authority, and the shippers' statements on how an extended authority grant would be utilized by each of them, that a *prima facie* case of public demand and need was established.

Allied is not seeking a broad territorial grant of general commodity authority. It wishes only to extend its intrastate operations into a discretely defined six-state area. In view of the national transportation policy set forth at 49 U.S.C. § 10101(a) mandating that the ICC follow a liberalized entry policy, we conclude that there is substantial evidence supporting the ICC's finding that a grant of unrestricted authority to Allied for the transportation of bulk com-

modities within a six-state area serves a useful public purpose responsive to public demands and needs.

### C. The Adequacy of the Findings

■ With all due respect, we find the concurring/dissenting opinion puzzling. It concedes that "creditable arguments can be proposed both for and against the sufficiency of the evidence of public need," Minority Opinion at 10, but appears to ignore the Supreme Court's comments in *Consolo, supra,* 383 U.S. at 620, 86 S.Ct. at 1026, that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."

After several years of what some would call bureaucratic bumbling and excessive delays within the Interstate Commerce Commission, the 1980 Motor Carrier Act was designed to eliminate unnecessary bureaucratic entanglements and to permit the agency to expedite its decision-making. As is stated in the House Report:

> The existing regulatory structure has tended in certain circumstances to inhibit innovation and growth and has failed, in some cases, to sufficiently encourage operating efficiencies and competition.

H.R.Rep. No. 1069, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2283, 2292. The congressional thesis was straightforward—Congress assumed that competition ordinarily benefits the public interest and that an administrative agency should catalyze rather than deter vigorous and fair competition.

The surest way for the courts to defeat this commendable congressional intent is to impose on administrative agencies the more verbose styles found in some appellate opinions. Yet all appellate judges know that the most lengthy or the most detailed findings do not exemplify the *only* style of sound opinion-writing, and indeed some may argue that the most prolix statements are not necessarily the most wise.

Administrative agencies function in a real world. They live with a process of high volume and usually modest staff support. By the ICC's most recent annual report in fiscal year 1981, they had 28,702 proceedings involving motor carrier operating rights, 20,461 of which were opened during that fiscal year. ICC 81, Ninety-Fifth Annual Report of the Interstate Commerce Commission, p. 94, September 30, 1981. Congress assumes that the agency has some expertise. They need not confront each case as if it is the first discovery of the wheel. Some crypticness is to be expected; it is perhaps unavoidable, and brevity is not necessarily a vice. The agency's performance should not be measured by whether they dazzle us with footnotes or blitzkrieg us with lengthy findings.

In the instant case, the Interstate Commerce Commission Appellate Division 2 had before it the more detailed findings of the Interstate Commerce Commission Review Board No. 2. The Appellate Division clearly identified the issues as well as noting with specificity the arguments of the applicant and the protestant.

When taken in tandem with the Review Board's earlier more detailed statement of facts and the Appellate Board's comment on the same, we have here a classic example of what the Supreme Court stressed in *Bowman* when it said that it "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman,* 419 U.S. at 286, 95 S.Ct. at 442. The Appellate Division wrote a succinct administrative decision, not a law review article. We nevertheless have no difficulty in discerning the path of the decision of Appellate Division 2.

In addition, we agree with the minority that "creditable arguments . . . for and against the sufficiency of the evidence of public need," Minority Opinion at 10, can be made, and therefore believe there is a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

Guided by ICC policy as expressed in Acceptable Forms of Requests for Operat-

ing Authority, Ex Parte No. 55 (Sub-No. 43A), 45 F.R. 86798 (1980), the ICC determined after considering all of the evidence of record, including the extensive evidentiary findings of Review Board No. 2 and the arguments raised by Allied and Port Norris, that an unrestricted grant of authority was appropriate. The grant of authority was not a clear error of judgment.

## IV.

We find, based on the record as a whole, that there is substantial evidence to support the ICC's decision to grant Allied authority to transport bulk commodities in the six-state area of New York, New Jersey, Connecticut, Pennsylvania, Delaware and Maryland, and that the ICC's decision was neither arbitrary nor capricious.

Accordingly, we will deny the Petition for Review.

ADAMS, Circuit Judge, concurring in part and dissenting in part.

The Court today upholds an Interstate Commerce Commission (ICC) determination that an applicant for authority, Allied Bulk Carriers, Inc. (Allied), demonstrated both its "fitness" to perform, and the existence of a "public demand or need" for, its proposed service. Although the majority rightly sustains the ICC's finding that Allied is fit, it is my view that the majority is incorrect in holding that the ICC adequately explained the basis of its decision that there was a public demand or need for the broad (i.e., non-radial as opposed to radial) authorization granted.

When the ICC grants operating authority under the governing statute, in addition to finding the carrier "fit, willing, and able" it must also find "that the service proposed will serve a useful public purpose, responsive to a public demand or need." 49 U.S.C. § 10922(b)(1)(A) and (B). A court of appeals cannot uphold ICC determinations as to "public demand or need" if those determinations are "arbitrary" or "capricious" or are "unsupported by substantial evidence." *See* 5 U.S.C. §§ 706(2)(A), 706(2)(E).

The Supreme Court made clear in *Bowman Transportation, Inc., v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), that to pass the "arbitrary and capricious" test,

[t]he agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 245, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

In *Port Norris Express Co., Inc. v. ICC,* 687 F.2d 803, 810 (3d Cir.1982) (*Port Norris v. ICC I*), we called attention to the essential role that a clear articulation of the ICC's findings and rationale occupies in the decisionmaking process.

Port Norris Express Co., Inc. (Port Norris), a competing carrier protesting the grant of authority to Allied, concedes that the initial determination of the ICC Review Board No. 2 was correct insofar as it found sufficient evidence of a public demand or need for limited or "radial" authority. "Radial" authority, also known as "facilities" authority, would have permitted Allied to haul bulk commodities, in a six-state area, to or from the facilities of the four shippers that supported Allied's application; thus, only where a facility of a supporting shipper was an origination or destination point would Allied have been allowed to provide interstate service. In granting Allied's administrative appeal from the restricted authority that the Review Board had awarded, the Appellate Division removed the "facilities" restrictions on Allied and awarded "non-radial" (also known as "irregular route") authority to Allied. That is, Allied was authorized by the Appellate Division to haul traffic between *any* two points in the six-state area, whether or not

the two points constituted originations or destinations of the four shippers.

I cannot agree, however, that the Appellate Division's rationale for awarding the expansive "non-radial" rather than the more narrow "radial" authority "may reasonably be discerned," as *Bowman* requires. The Review Board, after canvassing the evidence in considerable detail, provided a plausible explanation of its decision to grant only "radial" authority:

> The supporting firms are all large concerns with commodities to tender for transportation. Unfortunately, we cannot identify the extent of the public need for such transportation because neither the applicant nor the supporting firms has listed any actual, future, or representative origins or destinations between which traffic will or may be transported, nor have they attempted to describe, even in general terms, the geographical movement of the traffic. They have not even given the locations of the supporting firms' facilities or of any present or prospective customers. In these circumstances, we cannot conclude that the evidence submitted in support establishes a threshold case for the non-radial authority sought. Nevertheless, bearing in mind that the supporting firms do have traffic, we believe that some authorization is warranted and that the service described in the appendix [i.e., radial service] will serve a useful public purpose, responsive to a public demand or need. Cf., No. MC–119741 (Sub. No. 281) F, *Green Field Transport Company, Inc., Extension—39 States* (not printed), decided May 4, 1981. This is applicant's initial application for operating authority and it has presented no other evidence directed to elements of the national transportation policy enunciated at 49 U.S.C. 10101(a)(7) from which we might conclude that the operation as proposed would promote competitive and efficient transportation service designed to meet one or more of the enunciated policies.

Appendix at 59.

In contradistinction, the Appellate Division, reversing the Review Board on this point, merely entered the following cryptic, as well as conclusory, statement:

> Applicant ... argues that the review board erred by granting radial as opposed to the non-radial authority requested. Applicant points out that shippers are large firms which specifically stated all of their needs in a non-radial fashion. Applicant further asserts that any lack of information in its application is attributable to the Commission's team, and the shipper statement form in effect at the time of the filing of this application....
>
> We believe that the evidence considered in light of the pleadings requires a result somewhat different from that reached by the review board. Applicant correctly argues that the review board's grant does not enable it to perform the entire service for which a public need has been demonstrated....
>
> *We find:*
>
> Performance by applicant of the service described in the appendix will serve a useful public purpose, responsive to a public demand or need.

Appendix at 86–7. This quoted statement, plus an omitted summary of Port Norris' argument, represents *all* that the Appellate Division had to say regarding the evidence of a public demand or need for granting non-radial authority to Allied. Missing was even a cursory description of the supporting shippers' statements.

Because of reluctance to overturn an order of the ICC, I have sedulously scrutinized both the Appellate Division's opinion and the record in an effort to ascertain what the Appellate Division might have meant to communicate. Reading that opinion sympathetically, perhaps one could infer that the Appellate Division agrees with the arguments of Allied that it summarizes. These arguments reduce to two simple propositions: first, that the supporting shippers are "large firms which specifically stated all of their needs in a non-radial fashion"; and, second, that the paucity of evidence about public need is the fault of the ICC, not of Allied. But neither of these

**508**

contentions fills the void in Allied's proof; indeed, the second point concedes the void.

It is not possible to say what Allied could have been referring to when it alleged that the shippers "specifically" expressed "all" their needs in non-radial terms. There simply are *no* specific expressions in the record of non-radial needs. In response to item six on the ICC's form, which called for "[r]epresentative origins and destinations of supporting shippers' traffic ...," three shippers merely recited: "Between points in [the six states]" (Appendix at 17, 26, 30); and the remaining shipper wrote: "Between points in Pennsylvania and points in [the five other states]" (Appendix at 22). These statements, which are totally ambiguous as to *which* points in the six states require service, cannot be declared, without more, to be specific statements of non-radial needs. That a mere reference to the territory covered is ambiguous is confirmed by Allied's own statement, in its application, of "Authority Requested." Allied thought it important to spell out that it sought "to transport, by motor vehicle, *over irregular routes,* those commodities in the pertinent territory ..." Appendix at 6, emphasis added. More significantly, if it were so clear as to require no explanation that the supporting firms made non-radial statements of need then the Review Board could not have written an opinion explaining its view to the contrary.[1]

We do not know whether these were indeed the "specific" expressions of need for non-radial authority that Allied or the ICC had in mind. But if they were not, it is perplexing to perceive what else might have been meant. Nothing in the statements of AMETEK (Appendix at 21–4) or Union Chemicals (Appendix at 25–8) appears to answer to the description of an expression of need for non-radial service. Stauffer, enumerating the services it now employs, listed "common carriers, *irregular route carriers,* contract carriers, rail and barges," Appendix at 17, emphasis added. What Stauffer found most unsatisfactory about the existing services were "the occasional shipping/receiving delays due to lack of available equipment when required," *id.* at 17. Stauffer supported Allied's application because Allied had "evidenced the overall ability to meet [Stauffer's] transportation needs," *id.* at 18. One might therefore attempt to make the following inference: because Stauffer claims to have occasional delays with its current carriers, and because those carriers include irregular route carriers, perhaps Stauffer was seeking to say that it experiences delay with its irregular route carriers. And given that Stauffer believes Allied has the "overall" capability to meet Stauffer's requirements, one might reason that Stauffer is indirectly communicating the message that it needs Allied to transport its commodities over irregular routes. On the other hand, along with "irregular route carriers," Stauffer named "rail and barges" among the current services it uses, and it is obvious that Stauffer could not have meant that Allied had the ability to supply rail and barge services. Thus Stauffer's reference to Allied's "overall" competence could not have been intended to encompass all the types of service Stauffer currently employs, and it therefore seems impossible to ascertain whether Stauffer meant this reference to include irregular route services. Moreover, in outlining the scope of the traffic that it would tender to Allied, Stauffer mentions that it "ship[s] and receive[s] product at each of our 80 facilities across the United States ..." (Appendix at 17)—a statement suggestive of radial needs.[2]

1. The relevant passage from Allied's Administrative Appeal which the Appellate Division refers to in summarizing Allied's arguments reads: "Contrary to the beliefs of the [Review] Board the supporting firms did specifically state all their needs in a non-radial fashion." Appendix at 67. The Appellate Division, without explanation, appears simply to have adopted Allied's factual claims and rejected the Review Board's. Allied's administrative appeal creates the impression that each of the supporting shippers, in naming the six states, said in so many words that it required non-radial service in those states. *See especially* Appendix at 68. This impression is incorrect.

2. This impression is buttressed by Stauffer's specification that

Whether or not the ICC *could* have reasoned that Stauffer, AMETEK, and Union Chemical expressed a need for non-radial service from Allied, the stark fact is that it did not so set forth in its opinion, even by a sentence or a clause or phrase. Of the four shippers, Exxon comes closest to a direct indication of non-radial needs; it notes that its "traffic moves from a manufacturing facility directly to customers by truck or rail, or is moved by motor or rail to a bulk terminal and then moved to final destination by motor carrier." Appendix at 29. Exxon also asserted that "expanded services are required to meet our future needs and provide service *to any point we require.*" Appendix at 30, emphasis added. Yet even Exxon has not stated its needs specifically in terms of non-radial service.

The second argument for non-radial authority which the Appellate Division mentions is that the lacunae in the evidence should be attributed to the ICC and not to Allied. The majority does not refer to this argument, and presumably does not mean to rely upon it. The ICC cannot in general be permitted to compensate for an applicant's statutorily inadequate evidence by accepting the blame for the inadequacy, and the majority quite properly declines to accept an argument that would enable the ICC to approve applications that fail to meet the statutory mandate.

When an agency rejects the findings of its initial factfinder, there may be a special need for it to reveal the basis of its decision. The Appellate Division's decision here seems to border on being a summary reversal of factfinding. As a result, we are not only forced to comb the record in an attempt to fathom what the Appellate Division might have meant to say, but we must also try to deduce why the Appellate Division disagreed with the findings that were clearly articulated by the Review Board.[3]

[m]ultiple pick-up and delivery service without encumbering limitations, expedited services, and readily available equipment are most essential in the overall distribution and transportation of our products *from, to and between our facilities.*
Appendix at 18, emphasis added.

While proper deference requires a refusal to substitute our own appraisal of the evidence for the agency's reasonable alternative interpretation, the doctrine of deference surely does not sanction upholding a decision by interjecting reasoning that cannot fairly be adduced even from a sympathetic reading of the agency's findings. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

No one can quarrel with the majority's observations that administrative agencies are unduly burdened and that courts should not demand of such agencies "the more verbose styles found in some appellate opinions" or in law journal articles. Such observations, however, are not relevant here. In this proceeding, the Review Board clearly articulated in the space of two or three sentences its reasons for denying non-radial authority to Allied. Had the Appellate Division affirmed, there would have been no need for it to add anything in order for a court to comprehend the rationale for its decision. But the Appellate Division reversed the Review Board in a crucial respect, without incorporating in its opinion so much as a single phrase that would enable a reviewing court to discern the reasoning involved. Where the Appellate Division has disapproved the findings expressed by the Review Board, but has failed in any way to account for this disagreement, reading the Appellate Division's opinion in tandem with that of the Review Board makes the Appellate Division's decision all the more enigmatic.

Both the Supreme Court and this Court have made it plain that an agency's findings must be supported by substantial evidence, and must be reasonably articulated, and that these are separate requirements.

3. The ICC does not argue that this Court should restrict its attention to the Appellate Division's decision. Indeed, it seems to advert to the Review Board's extensive summary of the evidence in order to excuse the Division's almost complete failure to discuss the evidence. Respondent's Brief at 31.

*Bowman supra,* 419 U.S. at 284, 95 S.Ct. at 441; *Port Norris I, supra,* 809. We abdicate our responsibility when, faced with an inscrutable agency opinion, we uphold a decision solely on the grounds that it *might possibly* be supported by evidence in the administrative record.

In *Port Norris I,* this Court, after pointing out the inadequacy of the ICC's explanation of its decision, went on to examine the sufficiency of the evidence. In the case at hand, I would not reach the question whether the evidence suffices. The deficiencies of the evidence in *Port Norris I* were patent and we faced no difficult problems of weighing. There was no showing even of a *representative* need for bulk service, nor any genuine indication of fitness or willingness. Here, there is evidence of fitness and willingness in the record as well as evidence of public need for some portion of the service requested. Where the basis of the agency's decision is so obscure, and where creditable arguments can be proposed both for and against the sufficiency of the evidence of public need, it would not be practicable to decide on the adequacy of the evidence of need until the ICC has explained its decision in a manner that is amenable to judicial review.

What is more, it is quite possible that the result reached today is irreconcilable with *Containerfreight Corp. v. United States,* 685 F.2d 329, 332 (9th Cir.1982).[4] An appellate court should be especially hesitant to conclude that evidence is sufficient, in the absence of an adequate agency articulation, where to do so might create a split among the circuits.

As in *Burlington Truck Lines, supra,* 371 U.S. at 167, 83 S.Ct. at 245,

[t]here are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice. See *Siegel Co. v. Federal Trade Comm'n,* 327 U.S. 608, 613–614 [66 S.Ct. 758, 760–61, 90 L.Ed. 888. Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion." *New York v. United States,* 342 U.S. 882, 884 [72 S.Ct. 152, 153, 96 L.Ed. 662] (dissenting opinion).

Accordingly, I would vacate the order of the ICC insofar as it grants authority in excess of that approved by the Review Board, and would remand to enable the agency to choose whether to justify with more clarity the portion of the decision relating to the territorial scope of authority that was granted; to affirm the initial decision of the Review Board; to take and explain some other action consistent with the statute; or, if it believes it necessary, to ask for additional evidence.

---

4. According to *Containerfreight,*

    Applications have been denied to the extent that they exceed the demonstrated need for the proposed services. *Refrigerated Transport Co., Inc. v. ICC,* 663 F.2d 528, 531 (5th Cir.1981); *Green Field Transportation Co., Inc., Extension-General Commodities,* 132 M.C.C. 485, 492 (1981), *aff'd sub nom. Refrigerated Transport Co., Inc. v. ICC,* 673 F.2d 1196 (11th Cir.1982). In *American Trucking Associations, Inc. v. ICC,* 659 F.2d 452, 475 (5th Cir.1981) the court stated, "a grant of statewide authority has never needed support from all, or even most, munici-

palities in the state" but must have "support from a representative number of municipalities in the state." Manlowe's showing of need in a portion of Northern California is not "representative" of a need throughout the state. The statements of the supporting shippers on their face demonstrate a need only for services in the San Francisco Bay Area and at most to points between Sacramento in the North and Fresno in the South.
See also *Refrigerated Transport Co., Inc. v. ICC,* 686 F.2d 881, 888–89 (11th Cir.1982).